**MICRO CHEMICAL, INC., Plaintiff,**

v.

**GREAT PLAINS CHEMICAL CO., INC., Lextron, Inc., and Robert C. Hummel, Defendants and Counterclaimants,**

v.

**MICRO CHEMICAL, INC., and William Pratt, Counterclaim Defendants.**

Civ. A. No. 88–Z–499.

United States District Court, D. Colorado.

July 21, 1995.

Richard P. Holme, Donald E. Phillipson, Davis, Graham & Stubbs, Denver, CO, Howard Adler, Jr., Davis, Graham & Stubbs, Washington, DC, James S. Leigh, Mark S. Becker, John D. Vandenberg, Ramon S. Klitzke, Carole Schlaes, Klarquist, Sparkman, Campbell, Leigh & Whinston, Portland, OR, for Micro Chemical, Inc. and William Pratt.

Cassandra Gay Sasso, Kutak Rock, Denver, CO, Dennis J. Mondolino, Edward M. Reisner, Paul H. Blaustein, Michael F. Hurley, James M. Rhodes, Jr., Hopgood, Calimafde, Kalil & Judlowe, New York City, for Lextron, Inc., Robert C. Hummell and Great Plains Chemical Co. Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

WEINSHIENK, District Judge.

This matter came before the Court on a suit for patent infringement brought pursuant to 35 U.S.C. §§ 1–307. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1338(a), as well as *in personam* jurisdiction over the parties. Venue in this judicial district is provided by 28 U.S.C. §§ 1391(c) and 1400(b). Plaintiff, Micro

Chemical, Inc. (MCI), charged defendants Lextron, Inc., Great Plains Chemical Co., Inc., and Robert C. Hummel with infringing the patent-in-suit, U.S. Patent No. 4,733,971 ('971 Patent), entitled "Programmable Weight Sensitive Microingredient Feed Additive Delivery System and Method," which issued on March 29, 1988. MCI amended its complaint to add unfair competition claims under Colorado law.

Defendants denied plaintiff's allegations, and asserted counterclaims charging MCI and William Pratt with unfair competition, misappropriation of trade secrets, and violations of the antitrust laws. Defendants also requested a declaratory judgment that all claims of the '971 Patent are invalid, noninfringed, and unenforceable due to plaintiff's inequitable conduct before the United States Patent and Trademark Office (Patent Office). Finally, defendants assert that this action should be deemed an exceptional case pursuant to 35 U.S.C. § 285, warranting the award of attorneys' fees.

Prior to the trial, the parties agreed to dismiss the unfair competition claims against each other. (Second Stipulated Pretrial Order at 2–3.) During the trial, the issues of damages and defendants' antitrust counterclaims were bifurcated, and the case proceeded to trial to the Court solely on the issues of patent validity, infringement, inequitable conduct and exceptional case status.

Having considered all the evidence and arguments presented at trial, the Court now makes the following Findings of Fact, Conclusions of Law, and Order.

### FACTUAL BACKGROUND

1. MCI, a Texas corporation based in Amarillo, Texas, sells microingredient feed additives, such as vitamins and antibiotics, to large cattle feedlots. MCI provides to its customers, at no charge, machines which both measure the amounts of the microingredient feed additives and mix those ingredients with a liquid carrier to create a slurry. The slurry is then sprayed onto and mixed into a cattle feed ration before the feed is given to the cattle. William Pratt is the founder and president of MCI, and is the named inventor on the '971 Patent. (Ex. 1).

2. Defendants Lextron, Inc. and Great Plains Chemical Co, Inc., are from Greeley, Colorado. Though two names are used in the caption, they are a single Colorado corporation; the name was changed from Great Plains to Lextron in 1986. The name Lextron is used in this Order to refer to both entities collectively. Lextron competes with MCI in microingredients sales. Lextron also provides its customers with machines for measuring the microingredients, at no charge. Lextron's microingredients are also made into a slurry which is applied to a cattle feed ration prior to delivering the feed to the cattle. Defendant Robert C. Hummel is the founder and president of Lextron.

### FINDINGS OF FACT

### I. THE CATTLE FEEDLOT BUSINESS

3. Cattle typically are kept for about four or five months at a feedlot before being sent to slaughter. In a feedlot, a steer normally consumes approximately 25 lbs. of feed each day, resulting in a weight gain of about 3 lbs. per day. Microingredients are added to feed to promote growth and prevent sickness in the cattle.

4. Typically, feed is prepared in large 8,000 pound batches, which are composed of 7,500 pounds grain and roughage, 420 pounds protein and mineral supplements, and approximately 80 pounds of microingredients and their liquid carrier, most of which is water.

5. To prepare a batch of feed, the grain and roughage are often loaded by a front-end loader into a truck equipped with an auger to mix the feed. Also, the truck normally is equipped with a scale so that individual ingredients can be weighed as they are added to the truck.

6. After the major feed components are in the truck, the supplements are added and mixed into the feed ration by an auger in the truck.

7. After addition of all ingredients, including microingredients, the feed is further mixed in the truck for between one and four minutes as the truck is driven to the cattle pens. A trough, called a bunk, runs along the length of each pen. The feed is delivered

into the bunk by a chute from the truck as it drives along next to the bunk.

8. Microingredients typically are added to feed in one of three ways, which have not changed since the 1970's. The most commonly used method is for the feedlot to purchase premixed protein supplements containing the desired microingredients. Measured amounts of the supplements are mixed into the feed ration along with the other ingredients.

9. The second method of adding microingredients is known as the "top dress" method. A bag containing microingredients is opened and the contents are spread directly onto the feed in the bunks. The microingredients applied this way are in a more concentrated form than they are in the protein supplements.

10. The third method of adding microingredients to feed is to use a microingredient feed additive machine. These machines measure predetermined amounts of concentrated microingredients, either by volume or by weight. Some machines deliver the microingredients in dry form to the feed in the truck. Most machines are equipped to create a slurry of microingredients in a liquid carrier, usually water, which is then pumped out of a receiving tank and sprayed onto the feed and mixed into the batch of feed by the mixer in the truck.

11. One of the advantages of a microingredient additive machine is that it allows the nutritionist to custom formulate the rations given to each group of animals and to make adjustments in the formula, as needed, to maximize growth.

## II. THE '971 PATENT

12. William Pratt invented the subject matter of the '971 Patent, and MCI is the owner by assignment of that patent. (Ex. 1.)

13. The '971 Patent claims a programmable weight sensitive feed additive system and method. The Patent Office granted 94 claims on various aspects and combinations of MCI's weigh machine and weighing method inventions in the '971 Patent.

14. Weigh machines built according to the invention are installed at a livestock feeding site, such as a cattle feedlot, where on demand, selected microingredients are dispensed by weight, combined in a slurry, and mixed into batches of feed being delivered to livestock.

15. As testified to both by Mr. Pratt and Mr. Hummel, weigh machines enhance accuracy and reliability. As a result, such machines have been commercially successful, and have been in demand from livestock feedlots.

## III. ON–SALE BAR

16. In a handwritten note bearing the date 10/31/85 and the title, "Need Patent Filing Date," Mr. Pratt made several notes after reviewing sales files on MCI's dealings with the Sunbelt Feedlot in Hugoton, Kansas. (Ex. 117.) Mr. Pratt testified that he reviewed these files and created these notes after his attorney had explained the need to inform the Patent Office when the first public use or offer for sale of his patented invention occurred. The files Mr. Pratt reviewed in creating these notes no longer exist.

17. The entries germane to the offer of the weigh machine are set forth below:

12/05/84—Thought about offering MWS [Micro Weigh System]—made notes to self.

12/25/84—Phone said had been working on a weigh system—would have it ["available by" crossed out] in production by Feb. 1, 1985—installation possible by March 1?

12/26/84—MWS machine offered *in person* for 6D e 6L—no date promised. MWS not final version. (Ex. 117.)

18. Mr. Lee Isaac, co-owner of the Sunbelt Feedlot, confirmed that he had several meetings with Mr. Pratt, as well as several telephone conversations between October, 1984, and the beginning of January, 1985, during which Mr. Pratt offered to place a weigh machine at the Sunbelt Feedlot. Isaac testified that Mr. Pratt had told him "that it [MCI weigh machine] was more accurate than the volume machine." Mr. Isaac also testified that it was his understanding that the machine was not in an experimental stage but ready to be placed at the feedlot as soon as he would place an order. Under cross-examination by plaintiff's attorney, Mr.

Isaac reaffirmed his understanding that Mr. Pratt had offered him a weigh machine that was ready to be placed in his feedlot. Mr. Isaac's diary contains several entries reflecting meetings and conversations with Mr. Pratt in November and December, 1984. (Ex. TV.)

19. Mr. Pratt testified that his notations did not mean what they appeared to say. Where his notes indicated that the machine would be "in production by February 1, 1985," Mr. Pratt testified that this really meant only that a "production size machine" would be built by that date. Mr. Pratt further testified that where his notes said "installation possible by March 1," he actually meant that a machine might be ready to test in a feedlot by that date. Also, Mr. Pratt stated that what he in fact offered to Mr. Isaac was a volume machine, and that the notation MWS prior to the reference to an offer was only a reminder to himself that there had been some discussion of the weigh machine with Mr. Isaac, but it did not relate to the machine actually offered to Mr. Isaac.

20. The Court is unable to reconcile the plain meaning of the words Mr. Pratt wrote and his purported explanation of what those words signify, particularly when the plain meaning of the words is confirmed by the sworn deposition testimony of a third party witness with no interest in this litigation. Accordingly, the Court finds that Mr. Pratt did offer to place a weigh machine in the Sunbelt feedlot on December 26, 1984.

21. In determining the credibility of Mr. Pratt's explanation of the meaning of the entries on this document, the Court notes that, although this document contains purely factual recitations created by Mr. Pratt for his own use before his patent application was filed, and was never sent to Mr. Pratt's attorney, the document was withheld during discovery on the basis of the attorney work product doctrine, and was misdescribed on plaintiff's privileged document list. The document was produced only after this Court affirmed Magistrate Judge Donald E. Abram's ruling that plaintiff had waived all claims of privilege and after the Court ordered the production of all previously withheld documents.

22. Mr. Pratt testified in great detail relating to the development of his patented weigh machine from its conception in January, 1984, through the first commercial placement at the Randall County feedlot on March 20, 1985, in an attempt to show that his invention was not sufficiently developed to have been "on sale" at the time of his discussions with Mr. Isaac. Mr. Pratt stated that in the Spring of 1984 he built a prototype that included a dry ingredient storage bin which dispensed a dry ingredient into a pan suspended from a load cell which was operated by computer controls. After several months of testing various load cells, around July, 1984, Mr. Pratt built a second prototype with a separate frame using weigh bars connected to the receiving tray by rubber straps. (Ex. 177, 178.) By mid-December, 1984, Mr. Pratt had constructed a prototype with a 6 inch metal segmented weigh hopper that was rotatable by hand.

23. Mr. Pratt's development efforts accelerated in December, 1984, and on January 12, 1985, he conducted the "first complete weigh cycle of a full-scale prototype machine substantially as depicted in Figs. 4, 5, 6, 7, 8 and 9 of U.S. Patent No. 4,733,971 and described in the accompanying specification of the patent." (Plaintiff's Response to Defendants' Interrogatory No. 5, Ex. UP.)

24. Mr. Pratt testified that the January 12, 1985, prototype had two dry ingredients storage bins, one liquid ingredient storage bin, associated dispensing devices, and a weigh subframe that was attached by bolts with rubber grommets to prevent metal to metal contact between the weigh frame and the main frame. The weigh hopper was suspended from two load cells contained in towers as shown in the '971 Patent. The prototype contained a segmented, rotatable weigh hopper with separate compartments for four dry and two or three liquid ingredients. The weigh hopper rotated to dump the dispersed ingredients into an elongated mix tank with two motor driven propeller-like mixers. The plumbing was in place to fill the mix tank with water, and a discharge pump was in place to evacuate the slurry of microingredients and water. The January 12 machine was equipped with a Hardy Accu-

batch II computer which controlled the dispensing and cumulative weighing of the dispensed microingredients. Electronic switches were used to fill the mix tank with water, rotate the weigh hopper, turn the mixers on and off, activate the discharge pump and to activate the flush cycle of the mix tank. (Ex. DI.)

25. Prior to January 12, 1985, Mr. Pratt's development documents indicate that he was aware of the need for a means to prevent the transfer of vibrations to the load cell, and to prevent outside influences from causing the weigh hopper to move. He had made notes and drawings in December, 1984, illustrating the use of shock absorbing rods and stabilizers on the weigh hopper, (Ex. 180), flexibly mounting the subframe to prevent vibration transfer and enclosing of the entire machine in panels, (Ex. 179), to prevent air currents and hopper vibrations from affecting the accuracy of his weigh measurements. Pratt also began constructing his mix tank and slurry delivery system in December. (Ex. 185.)

26. The January 12 prototype used two 25 pound load cells manufactured by the Revere Corporation, the same load cells used in MCI's currently offered weigh machines. As reflected in tests run on the weigh machine on January 13, 1985, (Ex. UM), the weigh machine model was capable of achieving fairly consistent results in its dispensation of microingredients on that date.

27. Mr. Pratt continued to modify and improve his weigh machine and, by mid-February, 1985, he had completed construction of a second machine which was allegedly capable of achieving more accurate results because it incorporated additional isolation means that were not present in the January 12 machine. The second machine utilized a separate weigh frame, (Ex. 241), rubber isolation pads to isolate the load cell from vibrations of the weigh hopper or the main frame, longitudinal and lateral stabilizers on the weigh hopper, and a variable three speed mixer in the mix tank. The February machine was controlled by two RCA computers.

28. The February prototype was demonstrated to a group of bankers from Tulsa, Oklahoma, who visited Mr. Pratt's plant on February 28, 1985. Mr. Pratt characterized this demonstration of his weigh machine as its first public use. (Ex. 117.)

29. On March 20, 1985, Mr. Pratt installed a weigh machine at the Randall County Feedyard. (Ex. 117.) After doing a few hours of tests, the machine was used to prepare cattle feed beginning the same day. Additional modifications were made to the machine subsequent to its installation to solve vibration problems and other problems that had not been apparent previously. On April 1, 1985, Mr. Pratt installed another newly built weigh machine in a feedlot in Garden City, Kansas.

30. Plaintiff supplemented its interrogatory responses twice to attempt to move the date of reduction of practice of the patented invention from January 12, 1985, as stated in the original interrogatory response, (Ex. UP), to April 20, 1985, after the Randall County Feedyard machine had been operating successfully to prepare cattle feed for 30 days. (Ex. UQ, UR.)

31. Although Mr. Pratt's testimony and development notes indicate that he did not perfect the commercial embodiment of his machine until the end of March or the beginning of April, 1985, many of the modifications made to the machine by Mr. Pratt after January 12, 1985, did not relate to the invention covered by the claims of the '971 Patent. For example, Mr. Pratt testified that variations in auger size and auger speed, which are not mentioned in the patent claims, have a significant effect on the accuracy of the weight determinations. Similarly, he testified to wiring changes he made after he placed a machine at Randall County Feedlot which have nothing to do with his claimed invention.

32. Although Mr. Pratt testified that the separate weigh frame and isolation pads were "critical" isolation features not present on his January 12 prototype, after learning that Lextron was not using any isolating means in its weigh machine, Pratt discussed with his attorney the possibility of adding claims to his application which did not include any limitation calling for isolating means. (Ex. 243 at 54, 56.) A preliminary amendment adding such claims was subse-

quently filed by MCI's patent attorney, James Leigh. (Ex. 2 at 123–135.)

33. The January 12 prototype had all of the components of the ingredient mixing and slurry delivery systems that are covered by the "mixing" claims of the patent. Mr. Pratt testified that the January 12 system also cumulatively weighed ingredients, and it is apparent that the January 12 machine contained all of the elements disclosed in the "cumulative" weigh claims. In addition, the January 12 machine contained some isolation means, and Mr. Pratt's notes indicate that he was already planning the addition of other isolation means such as panels and stabilizer bars.

34. The Court finds that, at the time Mr. Pratt offered his weigh machine to the Sunbelt Feedlot, he had already built one prototype and was engaged in constructing the January 12 prototype. Mr. Pratt has not convinced the Court that his work subsequent to January 12 constituted the kind of experimentation that would remove his offer to Sunbelt from the ambit of 35 U.S.C. § 102(b).

## IV. INFRINGEMENT

35. Plaintiff's expert witness on patent law, Jacob Vilhauer, testified that Lextron has manufactured and placed in feedlots four different types of weigh machines, as follows: Type 1 machines utilized cumulative weighing; Type 2 machines utilized sequential weighing; Type 3 machines had no mechanical mixers in the receiving tank; and Type 4 machines had "down stream" or "remote" mixers. These machines were sold by Lextron to the Cactus Feedlots in Etter, Texas, the Wrangler Feedlot in Tulea, Texas, the Stratford Feedlot in Stratford, Texas, and the FSW Cattle Company. (Ex. 17.)

36. Plaintiff has stipulated that Lextron Type 3 machines, the type without a mechanical mixer in the mix tank, do not infringe any claim in the '971 Patent.

37. Mr. Vilhauer analyzed the Lextron weigh machines for infringement by categorizing the asserted claims of the '971 Patent in 3 groups: isolation claims; cumulative weighing claims; and mixing claims. He stated that not all cumulative weighing claims require cumulative weighing. Mr. Vil-

hauer also stated that he had not sought to determine whether any Lextron weigh machines infringed any claims of the '971 Patent under the doctrine of equivalents. (Ex. 11.)

38. Mr. Vilhauer included claims 1, 3, 9, 13, 45, 63, 74, 91, 93 and 94 in his grouping entitled isolation claims, and testified that Lextron's Type 2 weigh machines infringed all of those claims. He further testified that the compression mount used by Lextron was the "functional equivalent" of the sway bar disclosed in the patent-in-suit. He further stated that the red rubber horizontal alignment pad, located under the ear of the Lextron weigh hopper, acted as an isolator, as did the silicone seal between the microingredient storage bins and the machine frame. On this point, both Steven Godsey, the electrical engineer who had assisted in building both MCI's and Lextron's first weigh machines, and Charles Hoff, a Lextron design engineer who assisted in the development of the Lextron weigh machine, testified to the contrary. Mr. Vilhauer also testified that the panels on the Lextron weigh machine functioned as an isolator. Contrary to the testimony of James Leigh, MCI's patent attorney, Mr. Vilhauer testified that the rigid frame of the Lextron weigh machine is not an isolator as defined in the patent.

39. The Court disagrees with Mr. Vilhauer's analysis. Under the last paragraph of 35 U.S.C. § 112, "isolating means" cannot be interpreted to include specific isolators or combinations of isolators not disclosed in the specification and structural equivalence thereof. The compression mounting of the load cells used by Lextron is not the structural equivalent of the anti-sway bars disclosed as an isolating means in the patent. However, the Court agrees with Mr. Vilhauer that there is no structural equivalent to the rigid frame utilized in the Lextron machine disclosed as an isolating means in the patent.

40. The Court further finds that the panels on the weigh machine, the silicone sealant between the storage bins and the frame of the machine, and the horizontal alignment pads used in the weigh machine were also all present in the Lextron volume machine. That these structures in the prior art Lex-

tron volume machines may inherently perform an isolating function in the Lextron weigh machine does not mean that Lextron's continuing use of these old components in its weigh machines can now be found to constitute an infringement of Mr. Pratt's patent. In addition, plaintiff has failed to demonstrate where the equivalent of Lextron's use of silicone seal is shown in the patent.

41. The Court finds that neither the specific isolator nor the combination of isolators alleged by plaintiff to be included in Lextron's machines are the structural equivalents of the specific combination of isolators disclosed in the '971 Patent. Accordingly, Lextron's machines do not literally infringe the "isolating means" limitation in any asserted claim of the '971 Patent.

42. Mr. Vilhauer found that Lextron's Type 4 machines infringed claims 1, 3, 45, 63, 74, 93 and 94. His opinion was based on his characterization of the weigh pot, and the various Cactus Feedlots machines as being a remote mix tank.

43. The Court disagrees with Mr. Vilhauer's conclusion. The mixing claims of the '971 Patent require the creation of a slurry between the microingredients and a liquid carrier prior to their addition to the cattle feed. As pointed out by Charles Hoff, the weigh pots used in the Cactus Feedlots are actually the scales for the macroingredients in liquid form. Mr. Vilhauer conceded during cross-examination that the Cactus Feedlots weigh pots mix macroingredients such as liquid feed supplements, sugar and molasses. These liquid macroingredients cannot be characterized as "liquid carriers," and adding microingredients to these liquid macroingredients is essentially the same as adding the microingredients to the dry macroingredients. Thus, to the extent a slurry is created downstream of the receiving tank in the Type 4 machines, it is not a slurry of microingredients and a liquid carrier, but rather, a slurry of microingredients and the liquid macroingredients.

44. A second reason why the Lextron Type 4 machines do not infringe the '971 Patent is that plaintiff has not alleged that Lextron's sale of its weigh machines to Cactus Feedlots constituted a direct infringement, but only that it constituted inducing infringement. As testified to by Mr. Hoff, none of the machines sold by Lextron to Cactus Feedlots had mechanical mixers. In fact, Lextron sold no-mix volume machines for placement in the Cactus and Stratford Feedlots. MCI has failed to introduce any evidence showing that Lextron was aware that, by selling to Cactus Feedlots machines without a mixer in the mix tank, which concededly do not infringe any claim of the '971 Patent, it could be found liable for patent infringement. Absent such proof of intent, MCI has failed to meet its burden of proving that Lextron is liable for inducing infringement.

## V. WILLFUL INFRINGEMENT

45. MCI has alleged that Lextron should be held liable for willfully infringing the '971 Patent for the period of time from the institution of this litigation until it obtained the second opinion from Dressler, Goldsmith that the '971 Patent was invalid. (Ex. 114.) The Court cannot agree.

46. Plaintiff has stipulated that the Dressier, Goldsmith opinions are not sham opinions and that Lextron reasonably relied upon them.

47. Defendant Robert Hummel testified, and the actions of Lextron reflect, that Lextron relied upon those opinions, initially by converting their machines from cumulative weighing and removing the mixers, and subsequently by replacing the mixers in some of their machines.

48. The Court finds that, even if Lextron could be found to have infringed any claim of the '971 Patent, such infringement cannot be characterized as willful. MCI commenced this suit within days after the '971 Patent issued. As soon as it was sued, Lextron began efforts to design around the patent and took affirmative steps to follow the advice it had obtained from outside patent counsel to avoid infringing the patent. The four month time period between the commencement of this suit and when Lextron received the written opinion of counsel is not an unreasonable length of time considering the number and complexity of the claims in the '971 Patent.

## VI. FRAUD OR INEQUITABLE CONDUCT ON PATENT OFFICE

49. Lextron asserts that Mr. Pratt and Mr. Leigh engaged in inequitable conduct or fraud on the PTO by mischaracterizing the weigh machine developed by Sherman Brewster and by withholding information about the Great Plains volume machine. This Court disagrees with Lextron's assertions.

50. With respect to the Brewster weigh machines, special efforts were made by Mr. Pratt and Mr. Leigh to learn about the few Brewster machines that existed. These actions include having the machines looked at by MCI employees, taking a special trip in March, 1986, to Kansas and Oregon to examine each of the Brewster machines actually placed in feedlots, and an additional personal inspection of the Brewster Boardman weigh machine in May, 1987, by James Leigh. They also received representations about the Brewster weigh machines from Sherman Brewster himself (Ex. 174). As a result of these investigations, additional and accurate information was provided to the Patent Office in the Supplemental Information Disclosure filed August 28, 1986 (Ex. 2 at 27), and in the Third Supplemental Information Disclosure filed July 21, 1987 (Ex. 2 at 167; *see also* Ex. 69), both of which were submitted prior to the notice of allowance of the '971 Patent. (*See* Ex. 258.)

51. Although Mr. Leigh and Mr. Pratt stated in the patent application that "[I]t is believed that [the Brewster machine] was unsuccessful because it was too slow and too inaccurate for handling additive concentrates in a feedlot environment" (Ex. 2, p. 7), Lextron has failed to prove by clear and convincing evidence that either Mr. Pratt or Mr. Leigh believed such characterizations to be false or incorrect, or that they intended to deceive the patent examiner with these characterizations.

52. Lextron also asserts that part of the inequitable conduct or fraud on the Patent Office was the failure to disclose the prior Great Plains volume machine. It is undisputed that the Great Plains volume machine was not specifically described in materials submitted to the Patent Office. Mr. Pratt and Mr. Leigh each testified that the reason for not specifically describing the Great Plains volume machine was that it simply did not cross their minds to do so. They did disclose the prior art Hawes patents on volume machines, as well as the Pratt volume machine patent and other relevant prior art. They successfully had completed a patent infringement trial in front of then Chief Judge Sherman Finesilver of this Court, in which Judge Finesilver had ruled that the Great Plains volume machine infringed three of the Hawes patents which were disclosed to the Patent Office. (Ex. 115.) Therefore, in their minds at the time, the Hawes patents and the Great Plains volume machine probably were synonymous.

53. Lextron, in its sworn answers to MCI's initial interrogatories in this case about prior art, *itself* forgot to list the Great Plains volume machine as relevant prior art. (*See* Defendants' Response to Plaintiff's First Set of Interrogatories, Answer to Interrogatory 12, sworn to June 17, 1988, Ex. 233.) These were later supplemented by Defendants And Counterclaim Plaintiffs' Response To Plaintiff's And Counterclaim Defendants' Second Set Of Interrogatories, Answers To Interrogatories 20 and 23, served January 18, 1989. (Ex. 234.)

54. Lextron argues that its volume machine contained prior art not previously disclosed in the Hawes patents, namely the mechanical mixer of the Great Plains volume machine. However, the MCI patent application disclosed the Aldous patent, which was prior art having a mechanical mixer in batch mixers used in feedlots to create a slurry of dry feed and liquids in small quantities. (Ex. 2, p. 72; Ex. GF, '185 Patent.) Moreover, the asserted claims of the '971 Patent do not require mechanical mixers or mixing, but more broadly claim "flow-inducing means", "intermixing", or "positive intermixing" to form a slurry, elements which are shown in the prior art Hawes and Pratt volume machine patents. (See, *e.g.,* Ex. 1, claims 63 and 74.)

55. The failure to describe the Great Plains volume machine did not create a situation where material prior art was not disclosed, but at most was a failure to disclose prior art which was cumulative to the Hawes

and Aldous prior art which was disclosed in the '971 Patent application and prosecution.

56. Lextron argues that Mr. Leigh's intent to deceive and the importance of omitting a description of the Great Plains volume machine is shown by the evolution of what became the '971 Patent's Claim 94, as that claim was prosecuted in the Patent Office. The prosecution history shows instead that no intent to deceive was present, and that the patent examiner's knowledge of the mechanical mixer of the Great Plains volume machine would have made no difference.

57. In any case, Lextron has failed to prove by clear and convincing evidence that the failure to describe specifically the Great Plains volume machine during the '971 Patent prosecution was an omission of material, non-cumulative prior art and was done by either Mr. Pratt or Mr. Leigh with the intention to deceive the Patent Office.

## VII. MISUSE OF PATENT BY TYING

58. Both MCI and Lextron provide weigh machines to the feedlots without charge in the hope and anticipation that those feedlots will then purchase microingredients from the machine supplier. MCI enters into an "acknowledgement" with each of its customers to which it provides weigh machines, (Ex. 70), which provides that the weigh machine remains the property of MCI, and establishes several operating conditions for the machine which are designed to allow the machines to operate effectively and safely. The acknowledgement specifically allows the user to obtain microingredients from suppliers other than MCI. Thus, in pertinent part, the acknowledgment provides as follows:

d. *USER is not prohibited from using micro ingredients from others;* however, USER recognizes that it is in the best interest of both USER and MCI that the MICRO INGREDIENT SYSTEM operates accurately and dependably on every portion of feed treated by USER. USER also recognizes that certain stringent quality control standards exist for the physical and biological characteristics of feed micro ingredients utilized through the system. Such characteristics include potency, bulk density/flowability, hygroscopic nature, particle size, oil/dust content, physical/biological stability and viscosity.

e. USER recognizes that no assurances can be given by MCI regarding standards of MICRO INGREDIENT SYSTEM performance or proper delivery into the feed *if ingredients are utilized that are not obtained from MCI* or which have not satisfied equivalent quality control standards with respect to the physical and biological characteristics described in paragraph d. above.

(Ex. 70, par. 2, emphasis added.)

59. Mr. Pratt testified that he has never entered into an agreement or understanding with a customer requiring the customer, contrary to the terms of the written acknowledgement, to purchase microingredients from MCI. He gave examples of customers who had purchased microingredients from other sources without having their machines removed and customers who have purchased relatively small amounts of microingredients from MCI without having their machines removed. (Ex. 238.)

60. MCI has quality control standards for microingredient formulations used in its dispensing machines. (Exs. 75, 73.) Although MCI strongly encourages its feedlot customers to allow MCI to spot test the quality of the microingredients that the customers are obtaining from other suppliers and using through MCI's weigh machines, there was no evidence presented that MCI has ever removed a machine or threatened such removal if the customer failed to obtain those tests. Furthermore, MCI has tested microingredients provided by other sources and has approved those microingredients for use in MCI's machines. MCI has taken no actions to suggest that the acknowledgement is breached by customers who do not acquire their microingredients from MCI, or do not have them tested by MCI. The acknowledgement was not entered into as a result of force or threats by MCI. (*See* Isaac Dep. (12/13/89) at 17–18; Gottsch Dep. at 10–15; Park Dep. at 14–16, 18, 21–22.)

61. Lextron presented no evidence that MCI coerced any customers into purchasing microingredients from MCI that the customers would not otherwise have purchased from MCI, and did not show that the MCI ac-

knowledgement entered into by MCI's customers was a sham.

62. Lextron's President, Robert Hummel, testified that Lextron's own customers purchase virtually all of their microingredients from Lextron. Mr. Hummel specifically denied that Lextron's customers are subject to any agreements that require them to purchase from Lextron or are subject to any coercion from Lextron. Thus, the fact that customers purchase all or most of their microingredients from the weigh machine supplier is not clear and convincing evidence, or even a preponderance of the evidence, of an express agreement or of coercion creating a misuse of the weigh machine patent by tying its free use to the purchase of microingredients.

63. The Court finds that MCI did not misuse the patent by tying, or conditioning, its provision of free weigh machines to feedlot customers to the purchase of the customers' microingredient requirements from MCI.

## VIII. RELEVANT MARKET

64. The livestock or cattle feeding industry is comprised of more than 550 feedlots with a capacity of more than 4,000 head of cattle, more than 390 of which have capacities in excess of 8,000 head. Most of these feedlots are located in the Great Plains portion of the United States, with a significant majority of the feedlots being located in Nebraska, Kansas, Colorado, Texas and Oklahoma. As of December 31, 1991, MCI had placed approximately 110 weigh machines in feedlots, and Lextron had placed approximately 45. (Exs. 172, 278, OR.)

65. Both because of the nutritional requirements for cattle in feedlots and because of special health needs created as a result of the close confinement of large numbers of animals, all cattle in feedlots are fed special vitamins, disease prevention drugs, growth inducing drugs and other nutritional and health products.

66. These products are sold in several different forms. Feed supplements generally contain the foregoing vitamins and drugs, and are sold in relatively unconcentrated form in bulk which can be mixed easily into the cattle's basic food rations. These vitamins and drugs may also be provided in the form of "top dressing." More than 50% of the feedlots still utilize feed supplements or top dressing as the basic means for delivering all ingestible vitamins and drugs to livestock in the feedlot. (Exs. 172, OR.) Feed supplements and top dressing are readily substitutable for microingredients, both in terms of cost and convenience.

67. The Court finds that the relevant market for this case is the market for ingestible vitamins and drugs used in feedlots.

## IX. MISCELLANEOUS FACTS

68. All relevant acts of Mr. Pratt have been taken as president of MCI and properly within the scope of his duties.

69. All relevant acts of Mr. Hummel have been taken as president of Lextron and properly within the scope of his duties.

### CONCLUSIONS OF LAW

## I. CLAIM INTERPRETATION

70. A patent consists of a specification, which is a written description of the invention; drawings, which illustrate the invention; and numbered claims. The claims of a patent define the metes and bounds of the invention. The claims are to be read and interpreted in view of the patent drawings, the patent specification, and the file history of the patent application before the U.S. Patent and Trademark Office. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 336 U.S. 271, 277, 69 S.Ct. 535, 538–39, 93 L.Ed. 672 (1949); *Arachnid, Inc. v. Medalist Marketing Corp.*, 972 F.2d 1300, 1302 (Fed.Cir. 1992). Expert testimony and the other claims of a patent may also be considered to interpret claim language. *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 673–75 (Fed. Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).

71. Proper claim interpretation is necessary before a determination of infringement or validity can be made. Claim interpretation is a question of law. The claims must be interpreted the same way for validity as they are for infringement. *Jonsson v. Stanley Works*, 903 F.2d 812, 821 (Fed.Cir. 1990); *SmithKline Diagnostics, Inc. v. Hel-*

*ena Laboratories Corp.*, 859 F.2d 878, 882 (Fed.Cir.1988).

■ 72. The claim language should be read in accordance with the rules of the English language, using dictionary definitions to interpret the words unless it appears clear that the patentee used them in some different way. Although the applicant is permitted to be his own lexicographer, the definitions used cannot be inconsistent with the normal usage of a word. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387–1388 (Fed.Cir.1992).

■ 73. Where a patentee chooses to give terms uncommon meanings, he must set out his uncommon definition in some manner within the patent disclosure. The words must be used in the same way in the claims and in the specification. However, limitations from the specifications are not to be read into the claims. Further, narrow claim limitations cannot be read into broad claims either to avoid invalidity or escape infringement. *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1432–34 (Fed.Cir.), *cert. denied*, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988); *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed.Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988).

■ 74. The patent specification must conclude with claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. In order to be definite under § 112, the claims when read in light of the specification must reasonably apprise those skilled in the art both of the utilization and the scope of the invention. 35 U.S.C. § 112; *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1385 (Fed.Cir. 1986). An imprecise limitation does not necessarily impart invalidity to the claims, but the imprecision is a factor to be considered in a determination of infringement. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1280 (Fed.Cir.1988).

■ 75. Certain claims of the '971 Patent are expressed as a means for performing a specified function without reciting specific structure or materials to accomplish such function. These "means-plus-function" claims are construed to cover the corresponding structure set forth in the patent specification and equivalents thereof with identical function. Like the other claims which are allegedly infringed, such claims may not be given a meaning which would also cover a prior art reference or device. *Valmont Industries Inc., v. Reinke Manufacturing Co. Inc.*, 983 F.2d 1039, 1041–42 (Fed. Cir.1993); *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 933–34 (Fed.Cir. 1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). A specific means-plus-function clause of the '971 Patent is the "isolating means" limitation of Claim 1. When determining the meaning of the term "isolating means," the Court must look to the specific isolators or combination of isolators disclosed in the specification.

## A. *Accuracy*

■ 76. A central claim interpretation issue of the present case revolves around the meaning of the term "accuracy" as used in the claims. This term must be construed as it would by one of ordinary skill in the art based on the patent disclosure. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d at 1387.

77. At various times, MCI's witnesses expressed different opinions on the meaning of this term. None of the definitions given by MCI's witnesses was entirely satisfactory. It appeared that MCI's patent law expert, Mr. Vilhauer, struggled with the dilemma that if he construed this term as well as the term "isolating means" narrowly enough to provide a basis for urging patent validity, the patent would not be infringed, while if he read them broadly enough to provide a basis for an infringement claim, the teachings of the patent would be obvious.

78. Mr. Vilhauer has limited experience in batch weigh systems. His testimony on the meaning one skilled in the art would ascribe to terms in the patent cannot be totally relied upon. Thus, his opinion as to the meaning of terms in the patent should be afforded limited weight.

79. Claim 64 defines "an accuracy of at least ± one gram." The prior art Hough reference which was before the patent examiner defines accuracies within 0.01 pounds

(4.5 grams). Although the specification discloses 0.5 gram accuracy, the Court believes it would be error to incorporate this limitation into the claims, particularly where to do so would result in a narrower interpretation of the independent claims of the patent than dependent claim 64. Thus, the Court concludes that the term "accuracy" as used in the independent claims of the '971 Patent refers to accuracies between 1 gram and 4.5 grams. No other definition is consistent with the patent disclosure in view of the prior art of record in the file history of the patent. Moreover, there is no other definition which would apprise one skilled in the art of the metes and bounds of the invention in a sufficiently definite manner to comply with 35 U.S.C. § 112.

### B. Slurry

80. The term "slurry" appears numerous times in the patent claims. During trial, MCI's witnesses testified that this term should be interpreted as being restricted to a "homogeneous slurry." The Court finds no support for such a limitation in the specification, the file history, or the claims of the patent. The patent disclosure calls for mixing feed additives in a liquid carrier to "dilute, disperse and suspend" them. See Col. 1, lines 54–60; Col. 3, lines 44–47. This would seem to disclose to a person of skill in the art that a mixture of additives and carrier is required, not necessarily a uniform or homogeneous mixture.

### C. Mixing v. Positive Mixing

81. A third significant claim interpretation issue involves the meaning of the terms "intermixing" and "positive intermixing." MCI's position, as expressed by Mr. Vilhauer, is that these terms mean the same thing, i.e., simply "mixing." But this interpretation is contradicted by the file history of the '971 Patent. The original application Claim 42 called only for "intermixing" the feed additives. This claim was rejected by the patent examiner and withdrawn by the applicant. The claim was then re-submitted as calling for "positive intermixing," and was subsequently allowed by the patent examiner, as Claim 94 of the patent. The applicant's attorney argued before the Patent Office that the claim was now distinguished

over the "known prior art." Since the prior art before the patent examiner included various references which disclosed "mixing," the term "positive mixing" should be construed as being limited to a type of mixing which was not before the Examiner. The only such type which was not before the examiner and is also supported by the patent specification is mechanical mixing.

## II. VALIDITY

82. An issued patent is presumed valid. 35 U.S.C. § 282. This statutory presumption of validity places the burden on a party challenging the validity of a patent to establish facts demonstrating invalidity by clear and convincing evidence. This burden is always on the party asserting invalidity of a patent, regardless of whether the best prior art was before the patent examiner, although the burden may be more easily carried by evidence consisting of more pertinent prior art than that considered by the examiner. *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1553 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). All evidence bearing on the validity issue, whether considered by the Patent Office or not, is to be taken into account by the tribunal in which validity is challenged. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

83. The "clear and convincing" standard of proof of facts is an intermediate standard which lies between the "beyond a reasonable doubt" and "preponderance of the evidence" standards. "Clear and convincing" evidence has been described as evidence which produces an abiding conviction that the truth of the assertions is highly probable. *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 2437–38, 81 L.Ed.2d 247 (1984), *reh'g denied,* 468 U.S. 1224, 105 S.Ct. 19, 82 L.Ed.2d 915 (1984); *Buildex Inc. v. Kason Industries, Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988). Under the "clear and convincing" standard, proof need not be airtight. "The law requires persuasion, not perfection". *Id.* at 1464.

## III. ANTICIPATION

84. A claim is invalid if it is anticipated under 35 U.S.C. § 102. Anticipation is established when a single prior art reference discloses, expressly or under principles of inherence, each and every element of a claimed invention. The determination of anticipation is a question of fact. *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1449 (Fed.Cir.1984), *cert. dismissed, Hazeltine Corp. v. RCA Corp.*, 468 U.S. 1228, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984).

85. The Court believes that some of the claims of the '971 Patent, including Claim 1, may well be anticipated by the Brewster prior art weigh machines. However, the Court finds it unnecessary to resolve this issue in view of the findings made on the obviousness inquiry into patent validity.

86. The Court notes that a defense based on paragraph one of 35 U.S.C. § 112 was previously dismissed by the Court, and that no § 112 defense was listed by defendants in the Pretrial Order. However, some testimony at trial was directed to the issue of whether the claims of the '971 Patent complied with the requirement of the second paragraph of 35 U.S.C. § 112 that the claims particularly point out and distinctly claim the subject matter which the applicant regards as his invention. *See, e.g.*, Milnamow Tr. 1989–91. It appears that this issue may have been tried by the "implied consent of the parties." Fed.R.Civ.P. 15(b). Because the Court finds that all of the claims of the '971 Patent are invalid and unenforceable for other reasons, the Court makes no express finding on this issue.

## IV. OBVIOUSNESS

87. Even if a particular combination of elements is "novel" in the literal sense of the term, it will not qualify for federal patent protection if its contours are so traced by the existing technology in the field that the "improvement is the work of the skillful mechanic, not that of the inventor." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 149–150, 109 S.Ct. 971, 977, 103 L.Ed.2d 118 (1989). The purpose of the patent laws is to reward those who make some substantial discovery or invention. *Atlantic Works v. Brady*, 107 U.S.

192, 199–200, 2 S.Ct. 225, 230–231, 27 L.Ed. 438 (1882).

88. The nonobviousness requirement extends the field of unpatentable material beyond that which is known to the public under § 102 to include that which could readily be deduced from publicly available material by a person of ordinary skill in the pertinent field of endeavor. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. at 149–150, 109 S.Ct. at 976–977; *Graham v. John Deere Co.*, 383 U.S. 1, 15, 86 S.Ct. 684, 692, 15 L.Ed.2d 545 (1966).

89. A claim may be held invalid if it is obvious under 35 U.S.C. § 103. Obviousness is established when the claimed invention as a whole, in light of all of the teachings of the references in their entireties, would have been obvious to one of ordinary skill in the art at the time the invention was made. The question of obviousness is reached after answers to a series of fact questions have been found, and in the light of those answers. *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. at 693–94. These questions relate to the scope and content of the prior art; differences between the prior art and the claims at issue; the level of ordinary skill in the art; and any objective evidence, known as secondary considerations, which may be present as indicia of nonobviousness. *Ryko Manufacturing Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed.Cir.1991).

90. Title 35 U.S.C. § 103 requires a Court to presume full knowledge by the inventor of the prior art in the field of his endeavor as well as analogous arts. The proper way to apply the 35 U.S.C. § 103 obviousness test is to picture the inventor as working in his shop with the prior art references hanging on the walls around him; then when he encounters a problem, he examines the references for the solution. The claims of a patent are invalid when the invention was made merely by applying knowledge clearly present in the prior art.

91. It is not necessary that the prior art suggest expressly, or in so many words, the changes or possible improvements the inventor made. It is only necessary that the prior art implicitly supplied the neces-

sary suggestion to a person of ordinary skill that the prior art teaching could be employed to obtain the claimed invention. *FMC Corp. v. Hennessy Industries, Inc.,* 836 F.2d 521, 527 (Fed.Cir.1987); *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1556 (Fed.Cir. 1985).

92. The Court has previously set forth some findings as to prior art. The evidence is clear and convincing that the differences between the subject matter of the claims of the '971 Patent and the prior art are such that the subject matter of the claims as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the batch weigh system art.

93. In addition to the claims asserted by MCI, the Court has considered the remaining patent claims. All of these claims may be separated into three groups, as they were by MCI's patent law expert: (1) isolation claims; (2) cumulative weigh claims; and (3) mixing claims. The broadest claims of the patent are the mixing claims. The Court finds that the other patent claims do not contain any limitations that would render them nonobvious when considered as a whole in light of the prior art references. *See N.V. Akzo v. E.I. DuPont de Nemours & Co.,* 810 F.2d 1148, 1152 (Fed.Cir.1987).

94. The most pertinent prior art references are the Brewster machines and the Lextron volume machines. The only differences between the claims of the patent and the Brewster references are that certain claims require that mixing occur in the mixing vessel prior to discharge of the slurry while other claims call for cumulative weighing or multiple weighings of the feed additives before discharge from the weigh hopper.

95. One having ordinary skill in the batch weigh system art would have been well aware of the option of employing a mechanical mixer in order to obtain a more thorough blending of the feed additives and the water carrier prior to discharge. The Lextron prior art volume machines employed a mechanical mixer for this purpose. Similarly, various witnesses, including the inventor, Mr. Pratt, testified that cumulative weighing was a well-known expedient in the art.

96. The principal difference between the Lextron volume machines and the subject matter claimed in the patent is that the microingredient feed additives are not weighed by the Lextron machines. However, one having ordinary skill in the art would have been aware of the weigh mechanisms used in the Brewster machines, and it would have been obvious to employ such a mechanism to obtain more accurate dispensing of the feed additives. To the extent that the patent claims describe other differences, none renders the claimed subject matter nonobvious.

97. The Court has considered allegations of secondary considerations of nonobviousness. MCI argued that the present invention solved an accuracy problem prevalent in the prior art, and so achieved commercial success, and that it came after unsuccessful efforts by others.

98. "Secondary indicia" of invention such as commercial success must be considered during an obviousness determination. *Graham v. John Deere Co.,* 383 U.S. at 17, 86 S.Ct. at 693–94; *Stratoflex Inc. v. Aeroquip Corp.,* 713 F.2d 1530 (Fed.Cir. 1983). However, while secondary indicia must be considered, they do not control the obviousness inquiry. No amount of commercial success or other secondary indicia can save a patent claim obvious in fact. *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 768– 69 (Fed.Cir.1988), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989); *Merck & Co. v. Biocraft Laboratories, Inc.,* 874 F.2d 804, 809 (Fed.Cir.1989), *cert. denied,* 493 U.S. 975, 110 S.Ct. 498, 107 L.Ed.2d 502 (1989).

99. MCI presented evidence of Lextron's unsuccessful effort to design a weigh machine in 1984–85 as support for a conclusion of nonobviousness. The Court determines that this evidence is entitled to little weight in the obviousness inquiry. First, the project was given a low priority and then discontinued. There is no evidence of a concerted effort by Lextron to design a new device until the fall of 1985. Furthermore, although Lextron's initial efforts did not result in a commercially viable design, the fact that Lextron engineers were working on a weight based dispensing system would tend to sug-

gest that the concepts employed by the '971 Patent were obvious to those skilled in the art. *See Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1567 (Fed.Cir.1984).

100. MCI also offered evidence in support of a finding of commercial success. The weight given to commercial success becomes particularly problematic when it follows "once another supplied the key element" and there was no longer "a problem to be solved." *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d at 768 (1989); *Calmar Inc. v. Cook Chemical Co.*, 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966). Here, Brewster contributed the key element: an accurate weight based feed additive weigh machine, before Mr. Pratt conceived the alleged invention. Commercial success is also problematic in this case because MCI has not sold a single machine. The machines are simply given away, i.e., provided to the feedlot customers for free.

101. The Court finds that no amount of commercial success, or other objective evidence, can save the patent claims in issue. The claims are obvious.

## V. PATENT MISUSE—TYING

■ 102. A tying arrangement is a marketing method whereby one party will provide or sell one product (the "tying product"), only on the condition that buyers also purchase a different product (the "tied product"). *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

■ 103. Lextron claims that MCI's provision of free weigh machines to customers with the acknowledgment that the customer will purchase all its microingredients from MCI is an unlawful tying arrangement, in which weigh machines are the tying product and microingredients are the tied product. In order to prevail on this defense, Lextron must prove by clear and convincing evidence that weigh machines and microingredients are separate and distinct products; that microingredients are a staple item of commerce; that MCI has actually tied its provision of weigh machines to the purchase of microingredients from MCI; and that

MCI has market power in the relevant market. *See Senza–Gel Corp. v. Seiffhart*, 803 F.2d 661, 664–65 (Fed.Cir.1986); 35 U.S.C. § 271(d)(5).

■ 104. The Court concludes that, for purposes of the patent misuse defense, weigh machines and microingredients are separate and distinct products. *See Senza–Gel*, 803 F.2d at 670. The separate and distinct product test is different for an antitrust claim, and the Court expresses no view as to whether weigh machines and microingredients are separate products in that context. *See Jefferson Parish*, 466 U.S. at 18–22, 104 S.Ct. at 1561–1564; *Hirsh v. Martindale–Hubbell, Inc.*, 674 F.2d 1343, 1347 (9th Cir.), *cert. denied*, 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982).

105. Microingredients are a staple item of commerce since they have uses outside of the patent. *Polysius Corp. v. Fuller Co.*, 709 F.Supp. 560, 576 (E.D.Pa.1989), *aff'd*, 889 F.2d 1100 (Fed.Cir.1989).

106. A tying arrangement could be found to exist between weigh machines and microingredients if MCI refused to provide weigh machines unless customers also expressly agreed to buy microingredients exclusively from MCI. In the absence of an express tying requirement between MCI and the feedlots using its weigh machines, a tying arrangement can only be found to exist if MCI employed coercive conduct effectively to coerce feedlots into buying feed additives from it when they would have preferred to purchase such ingredients from other suppliers. *See Belliston v. Texaco, Inc.*, 455 F.2d 175, 183–84 (10th Cir.), *cert. denied*, 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972).

107. In determining whether coercion has taken place, it is not enough that MCI made strong efforts to persuade, encourage or cajole customers into buying its microingredients. Rather, it must be shown that MCI has actually forced customers to buy both products, and that any appearance of choice was merely a sham. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449–51 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d

55, 64–68 (4th Cir.1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

108. Since the Court has found that MCI's only agreement with its customers specifically provides that the customers may purchase microingredients from any source, and that such agreement is not a sham, Lextron's misuse by tying defense cannot succeed on this ground unless MCI has coerced its customers into purchasing its microingredients.

109. Since the Court has found that there is no evidence that MCI coerced its customers to purchase its microingredients, the Court concludes that Lextron's patent misuse by tying defense must fail.

110. Because of the above finding, the Court does not need to make a determination on the issue of MCI's relevant market power.

## VI. ON–SALE BAR

 111. Title 35 U.S.C. § 102(b) provides that an inventor is not entitled to a patent on his invention if it was "in public use or on sale in this country more than one year prior to the date of the application for patent in the United States...." The statutory bar of § 102(b) is strictly construed. A patentee is not allowed to attempt to derive any commercial benefit from his invention outside of the one year window provided by the statute for filing his patent application. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. at 149, 109 S.Ct. at 976–77; *Consolidated Fruit–Jar Co. v. Wright,* 94 U.S. 92, 94, 24 L.Ed. 68 (1877).

 112. Determination of whether a § 102(b) bar exists is a question of law. *Sonoscan, Inc. v. Sonotek, Inc.,* 936 F.2d 1261, 1263 (Fed.Cir.1991). A flexible approach to § 102(b) is necessary because of the infinite variety of commercial practices to which the on-sale bar may be applied. *Western Marine Electronics, Inc. v. Furuno Electric Co.,* 764 F.2d 840, 844 (Fed.Cir.1985); *National Cash Register Co. v. American Cash Register Co.,* 178 F. 79, 83 (2d Cir.1910).

 113. In determining whether an on-sale bar exists, the totality of the circumstances must be considered because the policies or purposes underlying the on-sale bar, in effect, define it. *Envirotech Corp. v. Westech Engineering, Inc.,* 904 F.2d 1571, 1574 (Fed.Cir.1990). The primary policy governing the application of § 102(b) is to prevent commercial exploitation outside the one-year grace period authorized by Congress. *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 860 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *Gould Inc. v. United States,* 579 F.2d 571, 580, 217 Ct.Cl. 167 (1978).

 114. It is not necessary that a sale be consummated in order for a patent to be held invalid under § 102(b). *Buildex, Inc. v. Kason Industries, Inc.,* 849 F.2d 1461, 1464 (Fed.Cir.1988). All that is needed is a firm offer prior to the critical date. Even a single offer, whether accepted or not, may constitute a bar. *RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 1062 (Fed.Cir.1989).

 115. There is no requirement that the patentee have the product actually on hand at the time of the offer for the statutory bar to be triggered. There is likewise no requirement that the patented invention be in its final form or that it be commercially marketable for a statutory bar to arise. In fact, it is immaterial for purposes of the statutory bar that the device was makeshift. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 836 and 838 (Fed.Cir.1984); *American Sunroof Corp. v. Cars & Concepts, Inc.,* 660 F.Supp. 1, 3–4 (E.D.Mich.1984), *aff'd,* 776 F.2d 1064 (Fed.Cir.1985). Further, there is no requirement that the patented invention be reduced to practice in order for an offer for sale to invalidate the patent. *UMC Electronics Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir. 1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). If the machine was offered for future delivery, the statutory bar applies even if delivery was not to take place until after the critical date. *Buildex Inc. v. Kason Industries, Inc.,* 849 F.2d at 1464.

 116. Section 102(b) may create a bar to patentability either alone, if the device placed on sale is an anticipation of the later claimed invention or, in conjunction with 35 U.S.C. § 103, if the claimed invention would have been obvious from the on-sale device in

conjunction with the prior art. *LaBounty Manufacturing, Inc. v. U.S. International Trade Commission*, 958 F.2d 1066, 1071 (Fed.Cir.1992); *UMC Electronics Co. v. United States*, 816 F.2d at 656.

■ 117. The application for the '971 Patent was filed on February 26, 1986. The critical date prior to which no commercial exploitation can have occurred is, therefore, February 26, 1985.

■ 118. The Court finds that defendants have shown that Mr. Pratt offered to place a weigh machine in the Sunbelt Feedlot on December 26, 1984. Once a defendant makes a *prima facie* case of an on-sale bar, the patent owner bears the burden of coming forward with convincing evidence to counter that showing. *U.S. Environmental Products, Inc. v. Westall*, 911 F.2d 713, 716 (Fed. Cir.1990); *Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1537 (Fed.Cir.1984).

119. MCI contended that, because it does not "sell" its weigh machines to its feedlot customers, but places them in the feedlots at no charge, the offer to Mr. Isaac was not the type of commercial exploitation that § 102(b) prohibits. The Court disagrees. MCI's practice of placing weigh machines at feedlots at no charge in order to sell microingredients is merely one example of "the infinite variety of commercial practices" to which the on-sale bar may be applied. *Philco Corp. v. Admiral Corp.*, 199 F.Supp. 797, 815 (D.Del. 1961). MCI's sales representative testified at deposition that the purpose of MCI's various contacts with Mr. Isaac was to make a sale. Whether MCI received payment for the machine or made its money through the sale of microingredients for use in the "free" machine is irrelevant. The offer to place a weigh machine in the Sunbelt Feedlot is the type of commercial exploitation which the statute prohibits from occurring more than one year prior to the patent application filing date. *See Strong v. General Electric Co.*, 434 F.2d 1042, 1046–47 (5th Cir.1970), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2207, 29 L.Ed.2d 681 (1971); *George R. Churchill Co. v. American Buff Co.*, 365 F.2d 129, 133–34 (7th Cir.1966).

■ 120. MCI also argued that there could not have been a definite offer for sale because, at the time the offer was made, Mr.

Pratt did not know whether his weigh machine would work for its "intended purpose;" i.e., he did not know whether it would be more accurate than the Brewster weigh machine and other, prior volume machines in a feedlot environment. MCI's argument is an attempt to introduce a requirement that the patented invention must be commercially marketable for the statutory bar to apply. Such a broad brush approach that the experimental use justification must be applied to the subject matter of the offer as a whole could lead to circumvention of the purposes of the on-sale bar. *See RCA Corp. v. Data General Corp.*, 887 F.2d at 1061–62. For example, under MCI's argument, the weigh machine could never be offered for sale because actual placement at the feedlot is required.

121. The Court concludes that it was the patented invention which was offered to Mr. Isaac at the Sunbelt Feedlot, notwithstanding plaintiff's argument that further development was needed before the patented invention was actually reduced to practice. MCI contends that the machine could not have been reduced to practice until it was operated in the harsher feedlot environment to which it would be subjected in commercial use. Even if this proposition is accepted, MCI failed to direct the Court's attention to any feature of the claims at issue that was not fully embodied in, or obvious in light of, the January 12, 1985 operation of the prototype weigh machine. *See LaBounty v. U.S. International Trade Commission*, 958 F.2d at 1071; *Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565, 1568–69 (Fed.Cir.1984); *General Electric Co. v. United States*, 654 F.2d 55, 63–64, 228 Ct.Cl. 192 (1981).

122. Mr. Pratt's subjective expressions that he was still experimenting on his invention after January 12, 1985, are entitled to little weight since they were expressed for the first time at trial. The Court notes that MCI's initial interrogatory responses stated that the invention had been reduced to practice on January 12, 1985. *See Western Marine Electronics, Inc.*, 764 F.2d at 842; *In re Brigance*, 792 F.2d 1103, 1108 (Fed.Cir.1986); *RCA Corp. v. Data General Corp.*, 701

F.Supp. 456, 466 (D.Del.1988), *aff'd,* 887 F.2d 1056 (Fed.Cir.1989).

123. The basis of the on-sale inquiry is whether the inventor thought he had a product which could be and was offered to customers. The objective evidence here indicates that Mr. Pratt offered the patented invention to Mr. Isaac at the Sunbelt Feedlot with the intention of commercial exploitation without any suggestion that the machine was still in the experimental stage. If Mr. Pratt held a secret belief that the device which was offered might not be accurate enough in a feedlot environment and thus unsatisfactory to customers, that is insufficient to avoid the legal conclusion of the § 102(b) statutory bar. *See Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,* 984 F.2d 1182, 1187–88 (Fed.Cir.1993); *Harrington Mfg. Co. v. Powell Mfg. Co.,* 815 F.2d 1478, 1481 (Fed. Cir.1986). In addition, many of the modifications testified to by Mr. Pratt as occurring after that date relate to non-claimed features of the device and are therefore irrelevant to whether the claimed invention was on-sale. *Western Marine Electronics, Inc.,* 764 F.2d at 847; *Harrington Mfg. Co. v. Powell Mfg. Co.,* 815 F.2d at 1481.

124. MCI's argument that the patented invention was still in development and that its use at Randall County Feedlot was an experimental use also is unavailing. The Court finds that the primary purpose of the Randall County installation was for commercial benefit, not experimentation. There was no testimony offered from a Randall County representative that the use of the machine was for experimental purposes. In fact, no evidence of experimentation was introduced at trial other than through the testimony of Mr. Pratt. Further, the fact that the Randall County weigh machine was used to prepare feed for cattle within a few hours of its installation weighs against MCI's claim that the machine was used experimentally for nearly a month after installation. *See LaBounty Manufacturing, Inc. v. U.S. International Trade Commission,* 958 F.2d at 1071–72; *Electric Storage Battery Co. v. Shimadzu,* 307 U.S. 5, 20, 59 S.Ct. 675, 683–84, 83 L.Ed. 1071 (1939).

125. The Court concludes that defendants have shown by clear and convincing evidence that Mr. Pratt offered his patented invention to Mr. Isaac of the Sunbelt Feedlot more than one year prior to the filing of the patent application. MCI has failed to counter that showing. Accordingly, the '971 Patent is invalid pursuant to 35 U.S.C. § 102(b).

## VII. LITERAL INFRINGEMENT

126. In order to find literal infringement, one must literally read each and every element of a properly interpreted claim onto a corresponding element in an allegedly infringing embodiment. *Stewart–Warner Corp. v. Pontiac,* 767 F.2d 1563, 1570 (Fed. Cir.1985). Infringement may also be made out under the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). However, at trial, MCI alleged only literal infringement, and the Court similarly will limit its analysis. *Nestier Corp. v. Menasha Corp.,* 739 F.2d 1576 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985).

127. The infringement determination is a two step process. First, the claims are construed as a matter of law. Then the claims as interpreted are applied to the accused product as a fact question. *Charles Greiner & Co. v. Mari–Med Mfg. Inc.,* 962 F.2d 1031, 1034 (Fed.Cir.1992); *Becton Dickinson & Co. v. C.R. Bard Inc.,* 922 F.2d 792, 796 (Fed.Cir.1990).

128. The patentee bears the burden of proving infringement by a preponderance of the evidence. *Amstar Corp. v. Envirotech Corp.,* 823 F.2d 1538, 1545 (Fed.Cir. 1987). The failure to meet a single limitation is sufficient to negate infringement of the claim. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991).

129. Having found the claims at issue invalid, it is axiomatic that Lextron cannot be held liable for infringement of the claims. Nevertheless, the Court makes the following findings regarding infringement.

## VIII. INFRINGEMENT OF "MEANS–PLUS–FUNCTION" CLAIMS

130. Claim 1 of the '971 Patent contains several limitations which are expressed in means-plus-function terms. The most signif-

icant of these, and the subject of a fairly substantial portion of the trial record, is the "isolation means" element. In particular, Claim 1 calls for "isolating means for isolating said weighing means from influences affecting the weighing function of said weighing means so accurate weight determinations are obtained". MCI contends that Claim 1 and dependent Claims 3, 9, 11, 13 and 45 are literally infringed.

131. Under 35 U.S.C. § 112 P 6, to satisfy a means-plus-function limitation literally, the accused device must perform the identical function required by the limitation and must incorporate the structure disclosed in the specification, or its substantial structural equivalent, as the means for performing that function. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed.Cir.1989).

132. If § 112 P 6 did not exist, claim language which requires only a means for performing a function might be indefinite. *Jonsson v. Stanley Works*, 903 F.2d 812 (Fed.Cir.1990); *Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196, 1201 (Fed. Cir.1987). While the use of means-plus-function language in a claim is clearly permissible by reason of § 112 P 6, a means clause does not cover *every means* for performing the specified function. Rather,

> [Section 112(6)] means exactly what it says: To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure *with the disclosed structure*, and must find equivalent *structure* as well as *identity* of claimed *function* for that structure.

*Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987) (en banc; emphasis in original) (citations omitted), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

133. Various means and combinations for isolating the weighing function, referred to as "isolators" during trial, are disclosed in the '971 patent application. Several MCI witnesses compared the accused Lextron machines with the disclosed structures in an effort to demonstrate literal infringement. The Court finds that this effort falls short of establishing infringement. First, MCI erroneously argues that if an accused

structure performs the function required by the claim it is structurally equivalent. That view has been specifically rejected by the Federal Circuit and cannot form the basis for an infringement finding. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d at 934. The Court further finds that the accused structures in the Lextron weigh machines are significantly different from those disclosed in the patent specification. *Valmont Industries, Inc. v. Reinke Mfg. Co.*, 983 F.2d at 1044–45; *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d at 1538–39.

134. Moreover, the combination of isolator profiles disclosed in the specification are likewise strikingly different from the combination of accused structures in Lextron's weigh machines. In an effort to prove infringement, MCI's witnesses testified that the rigid main frame of Lextron's machine was equivalent to the rubber base plate pads disclosed in the specification, the silicone sealants around the Lextron dispensing bins were equivalent to a separate frame, and the mounting of the Lextron weigh hopper in compression was equivalent to the use of sway bars. None of these structures, either alone or in combination, can properly be considered "equivalent" under § 112 P 6. Were the Court to find that the Lextron isolator profile represents an infringement of the patent, it would, in effect, be granting Mr. Pratt a monopoly on the concept of isolation. *See Gardner v. TEC Systems, Inc.*, 725 F.2d 1338, 1349 (Fed.Cir.1984).

135. The accused structures in the Lextron weigh machines were also all present, save one, in the Lextron prior art volume machines. Lextron's witnesses testified that the function of these structures remained the same when incorporated in the weigh machine. The Court finds that these previously incorporated structures cannot now be said to perform an identical function as the structures disclosed in the patent specification. *See Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d at 1388–89. The one feature that was not present in the Lextron volume machine was a pad supporting the load cell. Although the Court finds that this feature performs an isolating function, MCI has not identified a structural equivalent in the speci-

fication. In short, MCI has failed to meet its burden of proof for a finding of infringement of Claim 1. For the same reasons that Claim 1 is not infringed, dependent Claims 3, 9, 11, 13 and 45 also are not infringed.

## IX. INDUCING INFRINGEMENT

136. MCI further contends that Lextron has induced infringement of Claims 1, 3, 45, 63, 74, 93 and 94 by its provision of weigh machines to feedlots owned by Cactus Feeders. Under § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." To reach the issue of inducing infringement, the patentee must first demonstrate direct infringement. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341, 81 S.Ct. 599, 602, 5 L.Ed.2d 592 (1961).

137. Since the Court has found that MCI failed to satisfy its burden of proof to establish direct infringement, there can be no finding of inducing infringement.

## X. WILLFUL INFRINGEMENT

138. A finding that patent infringement has been willful naturally presumes a threshold finding of infringement. Since the Court has determined that there is no infringement, the claim for willful infringement is moot.

139. However, the Court will note that Lextron's conduct cannot be held as willful. The '971 patent issued after the accused Lextron machines were already on the market. Three days after issuance, MCI brought suit. Lextron immediately retained patent counsel to work with Lextron's engineers on a machine which would clearly avoid infringing all 94 claims of the patent. Such a machine was designed and its non-infringing status was confirmed in a lengthy opinion prepared by the Dressler, Goldsmith firm which was submitted to Lextron's president, Dr. Hummel, on August 23, 1988. Thereafter, a second opinion, directed to the validity of the patent, was prepared by the Dressler, Goldsmith firm on November 7, 1988. MCI's claim for willfulness ends as of that date. Both of the Dressler, Goldsmith opinions provide a reasonable basis for Lextron's actions, and they were, in fact, relied upon by Lextron.

140. The Court finds that Lextron acted with due regard for MCI's patent. Accordingly, even were the Court to have found literal infringement, there can be no willful infringement.

## *ORDER*

Based on the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED that Claims 1, 3, 9, 11, 13, 45, 47, 48, 49, 63, 65, 67, 68, 74, 79, 89, 90, 91, 92, 93 and 94 of United States Patent No. 4,733,971 be, and the same are hereby, declared invalid under 35 U.S.C. § 102(b). It is

FURTHER ORDERED that United States Patent No. 4,733,971 be, and the same is hereby, declared invalid under 35 U.S.C. § 103. It is

FURTHER ORDERED that United States Patent No. 4,733,971 be, and the same is hereby, declared unenforceable. It is

FURTHER ORDERED that judgment shall be entered in favor of the defendants, Lextron, Inc. and Robert C. Hummel, and against the plaintiff, Micro Chemical, Inc., on plaintiff's Complaint, and that plaintiff's Complaint shall be dismissed with prejudice. It is

FURTHER ORDERED that the Clerk shall enter judgment in favor of defendants Lextron, Inc., and Robert C. Hummel and against plaintiff Micro Chemical, Inc., on defendants' counterclaim for declaratory judgment that United States Patent No. 4,733,971 is invalid and not infringed. It is

FURTHER ORDERED that because this Court is unable to conclude that this is an exceptional case, the parties shall pay their own costs and attorneys fees. It is

FURTHER ORDERED that the Court determines that there is no just reason for delay, and expressly directs that judgment may enter pursuant to Fed.R.Civ.P. 54(b).