**MICRO CHEMICAL, INC., Plaintiff,**

v.

**LEXTRON, INC., Defendant.**

No. CIV. A. 88–Z–499.

United States District Court, D. Colorado.

Sept. 14, 2001.

---

FINDINGS OF FACT, CONCLUSIONS
OF LAW, ORDER, AND
JUDGMENT

WEINSHIENK, Senior District Judge.

This matter came before the Court on remand from the Court of Appeals for the Federal Circuit for the purpose of assessing the amount of damages owed to plaintiff, Micro Chemical, Inc. (Micro), by defendant, Lextron, Inc. (Lextron), for infringement of U.S. Patent No. 4,733,971 (the '971 patent). A suit for patent infringement is brought under 35 U.S.C.

§§ 1–307. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1338(a), as well as *in personam* jurisdiction over the parties.

A trial was held commencing on November 2, 2000, and concluding on November 8, 2000, during which both parties presented evidence to address the remaining damages issues in the action. Prior to the hearing, the manner in which damages should be calculated was resolved through motions for summary judgment. Based on the Court's findings that noninfringing substitutes were available to Lextron throughout the period of infringement and that Micro had failed to demonstrate the requisite demand for the patented invention, the Court held that Micro was not entitled to damages based on its alleged lost profits, but only to a reasonable royalty for Lextron's use of the patented invention.

Having heard and considered all of the evidence and arguments presented by the parties in support of the summary judgment motions and during the trial on damages, the Court now enters the following Findings of Fact, Conclusions of Law and Order.

**FINDINGS OF FACT**

**I. PROCEDURAL HISTORY**

1. This action was commenced by Micro in April 1988, and the trial on liability and damages was bifurcated. The liability issues were tried to the Court for two weeks in March 1993. Following trial, the Court found that the '971 patent was invalid, that various claims of the patent were not infringed, that Lextron had not induced infringement of the patent, that Micro did not obtain the patent by inequitable conduct, and that Lextron had not engaged in willful or deliberate infringement. *See Micro Chemical, Inc. v. Great*

*Plains Chemical Co.,* 900 F.Supp. 1386 (D.Colo.1995)(Great Plains Chemical Co. changed its name to Lextron, Inc. in 1986).

2. On appeal, the Court of Appeals for the Federal Circuit in January 1997 reversed the judgment of invalidity, affirmed the Court's findings that the "isolation" claims of the patent were not infringed, affirmed the judgment that there had been no induced infringement, and affirmed the judgment that the patent was not obtained inequitably. The case was then remanded to this Court for a determination on whether other asserted patent claims were infringed. *Micro Chemical, Inc. v. Great Plains Chemical Co.,* 103 F.3d 1538 (Fed. Cir.1997).

3. On remand, the Court found that the remaining patent claims were not infringed by Lextron's accused machines. On appeal, the Federal Circuit again affirmed in part and reversed in part, affirming this Court's holding that Lextron's president, Robert C. Hummel, was not personally liable for infringement and that claim 91 was not infringed, but finding infringement of claims 63, 74, 93 and 94. The case was then remanded to this Court for an assessment of damages. *Micro Chemical, Inc. v. Great Plains Chemical Co.,* 194 F.3d 1250 (Fed.Cir.1999).

4. After remand, the parties took additional discovery, and each moved for partial summary judgment on Micro's claim that Lextron's weigh machines, which had been modified in 1997 by removing the mechanical mixer (the "Type 5" machine), continued to infringe the '971 patent. Briefs were submitted and a hearing was conducted on September 6, 2000. At the hearing, the Court held that the Type 5 machine did not infringe the asserted claims of '971 patent. The Court also found that the Type 5 machine was an acceptable, noninfringing substitute for the patented machine that was available during the period of Lextron's infringement

and that Micro had not demonstrated a demand for the patented features of the machine. As a result, Micro's claim in the action for lost profit damages was precluded. (Hearing Transcript, September 6, 2000).

5. Micro moved for reconsideration of the Court's decision, in part because it claimed a lack of notice that it might be precluded from presenting a lost profits damages claim. Briefs were again submitted, and a hearing on the motion was held on September 28, 2000. Following oral argument, Micro's motion for reconsideration was denied. (Hearing Transcript, September 28, 2000).

6. Neither in its summary judgment papers nor in its motion for reconsideration did Micro offer any credible rebuttal to rebut Lextron's proof that the Type 5 machine was an acceptable noninfringing alternative and that there was no demand for the patented invention. Accordingly, Lextron was entitled to judgment barring Micro from presenting a lost profits damages theory. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

7. On November 2, 2000, the Court commenced a five-day trial on the question of Micro's damages due to Lextron's infringement of the '971 patent by the Type 2 machine. Closing arguments were held on December 18, 2000. The central issue at trial was the calculation of a reasonable royalty rate, and the determination of an appropriate royalty base.

## II. LEXTRON TYPE 5

8. Since the inception of this case, Micro has grouped Lextron's various weigh machines into five "types." All issues with respect to Type 1 machines, also known as "cumulative weigh" machines, have been settled by agreement of the parties. Type 2 machines, also known as "weigh/mix ma-

chines," are the focus of the instant action. Type 3 machines, also known as "no mix" machines, were admitted to be noninfringing by Micro. Type 4 machines, also known as "remote mix" machines, previously have been found to be noninfringing by the Court. *Micro Chemical v. Great Plains Chemical Co.,* 900 F.Supp. 1386 (D.Colo.1995).

9. After the Federal Circuit issued its decision in January 1997, Lextron began modifying its infringing Type 2 machines. The modifications mainly involved removing the mechanical mixers, enlarging the receiving tank, adding an additional water source to the exit of the receiving tank, modifying the computer program that controls the machine, and adding a second pump to the output. The resulting machine is the Type 5 machine. By May 1997, nearly all of the existing Type 2 machines had been converted to Type 5 machines.

10. On September 5, 2000, the Court heard cross-motions for summary judgment on whether the Type 5 machine infringed the '971 patent, and whether the Type 5 machine was an acceptable, noninfringing alternative to the '971 patent. Micro claimed that the Type 5 machine infringed on claims 63, 69, 70, and 93 of the '971 patent, all of which contained the terms "intermixing" and "slurry". The Court found that in arguments before the Federal Circuit, Micro had distinguished the '971 patent from prior art by narrowing its claim construction to cover positive intermixing and the creation of a homogeneous slurry. The Court held that a finding that forming any slurry of water and microingredients or any mixing of water and microingredients by a pump or the discharge line violates the '971 patent would broaden the claims of the '971 patent so as to cover known prior art. While the Federal Circuit did not explicitly find such a narrowing of claim construction, in

light of prior art, such a narrowing was implicit in its finding of validity. See *Micro Chemical v. Great Plains Chemical Co.,* 103 F.3d 1538, 1546 (Fed.Cir.1997).

11. The Type 5 machine does not have a mechanical mixer. While mixing of water and microingredients occurs as the two are pumped down the discharge line, there is no "positive intermixing." Furthermore, Lextron provided an analysis, conducted by Dr. Mary I. Wray, of the effluent output of a Type 5 machine showing that the slurry produced by the Type 5 machine is not homogeneous within the industry meaning of that word. Defendant's Motion for Summary Judgment, Exhibit I, June 21, 2000. As a result, the Court found that the Type 5 machine did not infringe on the '971 patent.

## III. AVAILABLE ALTERNATIVES

12. One of the traditional lost-profit analyses in infringement cases is derived from a Sixth Circuit case, *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir.1978). The *Panduit* court looked at: 1) the demand for the patented product, 2) the absence of acceptable noninfringing alternatives, 3) the patent holder's capability of exploiting the demand, and 4) the amount of profit the patent-holder would have made. *Id.* In a later case, the Federal Cicuit held that an acceptable substitute that was not on the market at the time of the infringement must be both noninfringing and have been available during the period of infringement. *Grain Processing Corp. v. American Maize–Products Co.,* 185 F.3d 1341, 1356 (Fed.Cir.1999). Micro's motion for summary judgment concerned whether the Type 5 machine was an acceptable, noninfringing alternative to the '971 patent, arguing that the Type 5 machine was not available during the infringement period,

and that the Type 5 machine infringes upon the '971 patent and other patents.

13. As noted above, this Court held that the Type 5 machine did not infringe the '971 patent, and that any allegations of infringement concerning other patents were not properly before the Court. Addressing the availability of the Type 5 machine, the Court found that it was not unreasonable for Lextron to have waited until the Federal Circuit overturned this Court's finding of invalidity for the '971 patent before designing the Type 5 machine. In *Grain Processing*, the court looked at whether: (1) the materials were readily obtained, (2) the effect of the modification was well-known, and (3) all the necessary equipment and know-how were available. *Id.* at 1354. In the instant case, all defendant did was remove the mixing element of a Type 2, add different-sized tanks, modify the discharge line, and alter the software. Defendant's modifications were guided by its experience with the Type 3 machine. The first Type 2 was converted only a few weeks after the Federal Circuit decision in January 1997, and all Type 2 machines had been converted to Type 5 machines by May 1997. The conversion process itself took about an hour. Based on this evidence, the Court held that the Type 5 was an acceptable, available, noninfringing alternative to the '971 patent.

## IV. CALCULATING DAMAGES

14. Prior to trial, Micro asserted that it was entitled to lost profits damages, arguing that absent Lextron's infringing activities, it would have made Lextron's sales to feedlots. To support its claim, Micro points to the increased number of microingredient machines in use since the introduction of the '971 patent weigh machines as proof of the demand for the patented invention.

15. As the Court previously noted, the issue of commercial success is problematic, as the machines are provided to the feedlot customers free of charge. *Micro Chemical*, 900 F.Supp. at 1404. During the liability trial on this matter, there was extensive testimony that whatever demand existed in the feedlots was for the microingredient feed additives, and not the microingredient machines. The evidence at trial showed that more than 50% of feedlots used alternatives such as feed supplements or top dressing instead of microingredient machines. *Id.* at 1399.

16. Lextron introduced evidence that non-infringing Type 3 machines were used continuously between 1988 until 1996, nearly the entire period of claimed damages. Presumably, any of the users of the Type 3 could have switched to weigh machines merely by requesting one from Lextron or Micro. Lextron also converted all of its infringing Type 2 machines to noninfringing Type 5 machines by early 1997, and was able to retain virtually all of its customers with the Type 5 machine. These facts tend to demonstrate that there was little discernible demand for a weigh machine with the features claimed in the '971 patent. To the extent that a weigh machine was preferred over other methods of delivering microingredients, the perceived advantage was not attributable to the patented features.

17. Seeking to avoid the problem of proving causation for its lost profits claim based on the Court's earlier findings, Micro suggested during the September 6t, 2001, hearing on summary judgment, and again at the hearing on its motion for reconsideration, that tests other than the well-recognized *Panduit* test may be used to establish an entitlement to damages based upon lost profits. Micro then argued that the market for microingredient machines may be viewed as a "two suppli-

er market" and, therefore, it would be logical for this Court to infer that nearly all the feedlots to which Lextron provided machines and sold microingredients would instead have resorted to Micro.

18. This contention is an about-face from Micro's position when Lextron's antitrust counterclaims were pending earlier in this action. At that time, Micro denied the existence of any relevant market for the machines alone and portrayed itself as only one of many competitors in a broadly defined market. With the antitrust counts safely mooted, Micro now asserts that the market is strictly for the patented machines, and within that market, Micro would have the power to control price and exclude all competition.

19. The Court previously has found that the relevant market is for microingredients themselves, not for microingredient machines. *Id.* at 1399. Thus there are many noninfringing alternatives which have been available in the microingredient market throughout the period of claimed damages. As noted above, however, there are many other suppliers and methods of adding microingredients to cattle feed, all of which preclude the analogy to the two supplier market that Micro now asks the Court to make. Given the heavy competition from these other sources, Micro cannot succeed in proving an entitlement to lost profits as damages by relying upon "inferences" only appropriate in a "two supplier market." Moreover, Micro's failure to take these other microingredient suppliers into account when quantifying its lost profits claim against Lextron demonstrates that the claim was fatally flawed from its inception as being far too speculative to justify a recovery.

20. In summary, Micro sought to establish its entitlement to lost profits for substantially all of Lextron's sales of microingredients based upon a distortion of the reality of the marketplace. However, no consideration was given to the many, varied factors that affect the decision of a feedlot to purchase microingredients from either Lextron or Micro or, alternatively, to forego the use of a dispensing machine (either weigh or volume) and use supplements or a top dressing method of application. In addition to the lack of demand noted above, these circumstances provide further independent grounds for the exclusion of Micro's claim for lost profits damages.

## V.  *GRAIN PROCESSING*

21. At the hearing on September 6, 2000, the Court ruled on summary judgment that the Type 5 machine represented an additional, available alternative noting that "all of the points mentioned in *Grain Processing* ... apply to this case." (Hearing Transcript, September 6, 2000); *see Grain Processing Corp. v. American Maize Prods. Co.*, 185 F.3d 1341 (Fed.Cir. 1999). Micro's motion for reconsideration acknowledged that this ruling standing along would preclude its lost profits claim and strenuously argued for its reversal. However, none of Micro's arguments contravene the evidence of record on which the Court relied.

22. The reasons enumerated by the Federal Circuit in *Grain Processing* for ruling that the defendant's process was available were: 1) that the materials could be readily obtained; 2) that the effect of the modification was well known; 3) that all necessary equipment and know-how was available whenever the defendant chose to make the modification; and 4) that the defendant did not have to "invent around" the patent. *See Grain Processing*, 185 F.3d at 1354. The declarations of Lextron's Chief Engineer, Charles Hoff, and its Assistant Division Manager, Steve Freeman, as well as other evidentiary materials submitted by Lextron on summary

judgment clearly demonstrated that each of the *Grain Processing* factors was satisfied by the conversion to the Type 5 machine.

23. Both deponents testified that in order to create the noninfringing Type 5 machine, Lextron simply had to remove the mixer from its Type 2 machine. The only other design change was the use of three different size tanks fabricated from readily available parts to accommodate Lextron's customers use of different volumes of microingredient products per batch of feed. (Hoff Decl.). Revisions to the computer programming were also made to provide for the conveyance of microingredients out of the tanks without prior mixing. This software change allowed the discharge pumps to be flooded with water prior to being started. (Freeman Decl.).

24. The effect of removing the mixer was known by Lextron from its experience with the noninfringing Type 3 machine and led directly to the minor alterations to the Type 2 machine that were necessary to carry the unmixed microingredients out of the receiving tank and to the feed truck without clogging. (Hoff Decl.). Lextron's engineers understood from the implementation of the Type 3 machine that additional water was needed to the extent that some large batches of dry microingredients could clog the discharge pumps since the machines without mixers no longer created a homogeneous mixture in the receiving tank. (Hoff Decl.). The necessary equipment to retrofit the machines was readily available throughout the period for which Micro claimed damages. (Hoff Decl.). In fact, the retrofitted machine was considered by Lextron to be a Type 3 machine upon removal of the mixer. It was Micro who labeled the machine as Type 5. (Freeman Decl.).

25. Micro's primary contention in its motion for reconsideration was that the Type 5 machine was "not known, not in existence, and had not been proven to accomplish the desired result." The fundamental fallacy in this argument is that it ignores the existence of the Type 3 machine since 1988 and its successful use in feedlots until 1996. (Hoff Decl.). Thus, Lextron did not have to "invent around" the patent as Micro alleged. The solution to creating a noninfringing machine was the removal of the mixing devices used to provide a homogeneous slurry. Contrary to Micro's assertions, this solution was not "theoretically available" but well known to Lextron and successfully employed for years at a number of feedlots.

26. The first Type 5 machines were converted in January 1997 within a few weeks of the Federal Circuit's decisions upholding the validity of the '971 patent. (Freeman Dep.). The training of Lextron servicemen to accomplish the conversion of the Type 2 to the Type 5 machine took "approximately one hour." (Greiman Dep.). The design of the new tanks and the software to implement the water delivery system was completed and in place by February 1997, only a month after the project began. (Freeman Dep.). This time period was so short because Lextron already understood the potential clogging effect of removing the mixer. (Hoff Decl.). A similar time frame was described in *Grain Processing* as "practically instantaneous" for a large scale production. *Id.* at 1346.

27. The conversion of all of Lextron's machines was not implemented earlier because prior to 1997, Lextron had numerous Type 2 machines in the marketplace, which were accused by Micro of infringement, with mixers that would have been expensive to remove. In addition to the cost of conversion, Lextron had used mixers in its prior art volume machines to create a homogeneous slurry for at least ten years

prior to the issuance of the '971 patent. The Type 3 ("no mix") machines also were accused by Micro of infringement until the 1993 trial in this action. As this Court has previously found, Lextron relied in good faith on the Dressler, Goldsmith patent opinion of invalidity in continuing to use the mixers in the Type 2 machine. *See Micro Chemical, Inc.*, 900 F.Supp. at 1409. That opinion determined that the claims of the '971 patent were invalid as obvious under 35 U.S.C. § 103 in view of the Brewster weigh apparatus in combination with the mixer of the Lextron volume machine.

28. This Court agreed with that conclusion after the 1993 trial of the action and held the patent invalid. *Id.* at 1402–03. It was not until the Federal Circuit's decision of January 1997 overturning the Court's invalidity holding (103 F.3d at 1546) that Lextron retrofitted its machines to the Type 5 design by removing the mixer. Considering its belief and this Court's holding that the '971 patent was invalid, it is not unreasonable that Lextron chose not to modify all of its machines earlier. The Court therefore ruled on summary judgment that "[t]he Type 5 machine is an acceptable alternative available within the meaning of the *Grain Processing* and the *Panduit* tests." (Hearing Trans., September 6, 2000). None of Micro's arguments compel a different conclusion.

## VI. APPROPRIATE MEASURE OF DAMAGES

29. Trial was conducted before the Court on Micro's claim for reasonable royalty damages. Micro asserted entitlement to a reasonable royalty in a range of from 6 to 8% on Lextron's sales of microingredients, resulting in damages of $5.2 to $5.5 million. Lextron challenged Micro's claim as excessive and asserted that a royalty of no more than 1% represented fair compensation, calculated in a range of $650,000 to $870,000 dependent upon the applicable royalty base.

30. The parties each offer various products and services to the cattle feeding industry. Their principal customers are cattle feedlots of at least 4000 head occupancy. (Lomax Tr. 272; Ackerman Tr. 857).[1] There are approximately 600 such feedlots which are located primarily in the Great Plains region of the United States, including Colorado, Kansas, Nebraska, Texas and Oklahoma. *See Micro Chemical, Inc.*, 900 F.Supp. at 1399. The average size feedlot that the parties service is approximately 19,000 head occupancy. (Pratt Tr. 443).

31. Micro and Lextron have each been in the business of providing microingredient machines for a feedlot's use since the 1970's. (Pratt Tr. 305–06; Hummel Tr. 156). Initially, the feedlots were charged a fee, typically in the form of a lease, for the use of the machines. (Pratt Tr. 307; Hummel Tr. 151). This practice quickly gave way to offering the machines free of charge in exchange for the feedlot's commitment to purchase the bulk of its microingredient needs from the machine supplier.

32. When their businesses started, the parties only offered types of machines that dispensed microingredients for inclusion in the cattle feed volumetrically, i.e., volume machines. In the mid–1980's, both Micro and Lextron expanded their lines to include machines that dispensed the microingredients by weight. (Pratt Tr. 311; Hummel Tr. 91). The parties also offer various other systems for a feedlot's use, including feed batching systems, accounting systems, feed bunk reading systems and veterinary records systems. (Acker-

---

1. All references to the trial transcript and exhibits in this section of the Court's findings on reasonable royalties refer to the trial beginning on November 2, 2000.

man Tr. 854, 861–63; Anderson Tr. 808–09).

33. In 1988, when the '971 patent issued and Micro commenced this action against Lextron a few days later, the parties had placed a total of 209 microingredient machines in cattle feedlots. In 1997, at the close of the damages period, this number had increased only slightly to 237 machines. (Plaintiff's Exhibit (PX) 462).

### A.  *The 1986 Settlement Agreement*

34. Prior to this action, the parties were previously involved in a patent suit concerning the volume machines. *Great Plains Chemical Co. v. Micro Chemical, Inc.,* 652 F.Supp. 1 (D.Colo.1985). The action was settled by agreement of the parties in 1986.

35. At trial, Micro argued that the 1986 settlement agreement was highly probative of the royalty rate that should be applied in this case. The agreement provided for a running royalty on Lextron's sales of microingredients to its volume machine customers of 5% for the three patents asserted in the suit. (PX 116). The 5% royalty rate was tiered so that upon the expiration of one of the patents in March 1987, the rate was lowered to 3% until the expiration of the last to issue patents in June 1989. (PX 116).

36. The settlement agreement specifically provided for arbitration proceedings to determine noninfringing designs. (PX 116). This provision allowed Lextron to submit a proposed noninfringing design for Micro's review and take the matter to arbitration if the parties disagreed. (PX 116).

37. At the time the agreement was entered, Lextron had created a noninfringing design and did not anticipate paying royalties under the agreement after its installation. (Hummel Tr. 158). Accordingly, the rate called for in the settlement agreement was essentially nominal. (Pratt Tr. 468).

The redesigned Lextron volume machine employed a manual flush as opposed to the automatic flush covered by the Hawes' patents. (Hummel Tr. 159).

38. Because Micro refused to concur on noninfringement, Lextron brought its manual flush machine before the arbitrator. (Hummel Tr. 160). The arbitrator decided the infringement question in Lextron's favor, ending any obligations to pay royalties in January 1987, less than a year after the settlement agreement was entered. (Pratt Tr. 478; Hummel Tr. 160).

### B.  *Alternatives To The '971 Patented Weigh Machine*

39. The Court has noted its previous findings on the relevant market and available alternatives to the '971 patented machine. *See Micro Chemical, Inc.,* 900 F.Supp., at 1399. These findings were further confirmed by the testimony introduced at trial. For example, although Micro's president, William C. Pratt, testified initially that the advent of his patented weigh machine had made volume machines obsolete, he agreed that nearly 25% of his business was still comprised of volume machines in 1997. (Pratt Tr. 396). Both companies continued to place these machines throughout the period from 1988 to 1997. (Anderson Tr. 814; PX 462). Mr. Pratt admitted that at the 1993 trial, he had testified that the feed supplement manufacturers were Micro's "biggest competitors." (Pratt Tr. 405). Prior to that trial, Mr. Pratt had filed an expert report stating that Lextron's volume machine, other microingredient dispensing machines and feed supplements were all "viable alternatives" to the machines covered by the '971 patent. (Pratt Tr. 455–56).

40. Various other witnesses and exhibits confirmed that, despite a price premium of 8 to 10% to cover the cost of servicing the machines, Micro and Lextron each

compete directly with the feed supplement manufacturers on price and set their prices on microingredients to individual feedlots to get or retain that feedlot's business in the face of competition from feed supplements. (Lomax Tr. 259–61; Ackerman Tr. 853–55; Pratt Tr. 406; Defendant's Exhibit (DX) DED; DX DAO; DX DAV; PX 312).

41. Although both companies lost business to the feed supplement manufacturers during the period of claimed damages, (Anderson Tr. 818), Mr. Pratt acknowledged that of the customers who switched from Micro's patented weigh machine to an alternative method of microingredient delivery during this time period, twenty-five went to feed supplements and twenty-six went to Lextron, including at least one customer who opted for a Lextron volume machine. (Pratt Tr. 407–09; DX DED).

42. Various witnesses testified as to the relative advantages of weigh machines versus volume machines and microingredient machines versus feed supplements. To appreciate these distinctions, it needs to be understood that the microingredients themselves are manufactured by large pharmaceutical companies, including Pfizer, Elanco and Upjohn. (Lomax Tr. 262). These companies sell their product to Micro, Lextron and feed supplement suppliers, including Cargill and Ralston Purina, who act as distributors to the cattle feedlots. (Anderson Tr. 805; Lomax Tr. 213).

43. The feedlot's management, typically with the assistance of a consulting nutritionist, determines the feedlot's microingredient requirements to optimize the growth and health of the cattle. (Lomax Tr. 211–12). The microingredient distributors, whether feed supplement or microingredient machine suppliers, bid for this business. (Lomax Tr. 213; Ackerman Tr. 855); DX DAV, PX 418, PX 420).

44. The feed supplement manufacturers pre-package the microingredients in accordance with the feedlot's stated requirements. (Lomax Tr. 213). The microingredient machines provided by Lextron and Micro offer the feedlot the flexibility to measure and dispense the microingredients through the machine for inclusion in the feed ration. (Ackerman Tr. 904). Either a weigh or a volume machine will provide this flexibility.

45. In addition, microingredient machines provide a measure of accuracy in the inclusion of the microingredients, as well as a measure of reliability in their inclusion to the extent that the feedlot itself prepares the feed ration. Again, both the weigh and volume machines provide these advantages. (Hummel Tr. 203; Anderson Tr. 813; Ackerman Tr. 904).

46. The distinction between the weigh machines and the volume machines relates principally to the cost of servicing the machines. (Pratt Tr. 340; Ackerman Tr. 847). The volume machines require more frequent servicing by Micro and Lextron to maintain their accuracy and reliability. (Lomax Tr. 231–32). Thus, the weigh machines are cheaper to service.

47. Witnesses from both parties testified that their feedlot customers did not understand the technical specifications and other differences between the weigh and the volume machines. (Lomax Tr. 224; Anderson Tr. 810). The witnesses also testified that the choice of what type of machine to install, particularly because it was being provided free of charge, was largely up to the machine supplier. (Hummel Tr. 167–68; Anderson Tr. 810–11).

48. Thus, to the extent that Micro argued that the increase in the number of weigh machines in use was highly probative of the value of the invention, the Court finds that many of these machines were simply converted from volume to weigh as a cost savings device. (Hummel Tr. 161–62; Pratt Tr. 340; Anderson Tr. 812).

Moreover, as noted above, the total number of machines from 1988 through 1997 remained relatively static, increasing only slightly. (PX 462).

## C. The Profitability Of The *Microingredient Machine Business*

### (1) *Incremental Profitability*

49. The period of claimed damages is 1988 to 1997. Both parties presented expert witnesses who had analyzed Micro's incremental profitability in response to Micro's argument that the sales it may have obtained from Lextron would have accrued to Micro at this profitability rate. (Pratt Tr. 393). Stephen Duree testified on behalf of Micro. Laura Boothman testified on Lextron's behalf. For the reasons discussed below, the Court finds Ms. Boothman's testimony more credible.

50. Mr. Duree testified that he analyzed Micro's cost structure to determine which costs were fixed and which would be variable if Micro had obtained the sales of microingredients that Lextron achieved during the period of claimed damages. (Duree Tr. 727–731). From his study, Mr. Duree concluded that Micro's incremental profitability on Lextron's sales would be approximately 12.0%. (Duree Tr. 726).

51. Ms. Boothman conducted a similar analysis and determined Micro's incremental profit rate in a range of 4.3 to 6.2%. (Boothman Tr. 919; DX DIA, DX DIJ). Ms. Boothman then testified as to the principal differences between her analysis and that of Mr. Duree. She demonstrated that Mr. Duree assumed that Micro's gross margin would remain the same on sales obtained from Lextron. (Boothman Tr. 918). Ms. Boothman testified that this analysis failed to account for Lextron's customer mix and the sales of particular products to those customers. (Boothman Tr. 926).

52. To illustrate, Ms. Boothman demonstrated that 1) the range of gross profit margins across the spectrum of microingredient products varies greatly; 2) small differences in product mix to an individual feedlot customer can significantly affect margins; 3) the prices that Micro charged to individual feedlots vary more than 25%; and 4) Lextron's customers on average had a higher purchase volume with correspondingly lower prices. (DX DAD, DX DIC, DX DID, DX DIE). Ms. Boothman thereby concluded that if Micro were to sell to Lextron's customers, it would sell at largely the same prices and have the same margins as Lextron. (Boothman Tr. 920–25).

53. The other principal difference between the experts concerned salary expense. Ms. Boothman credibly demonstrated that administrative salaries, sales and service salaries and plant salaries would increase linearly with the assumed increase in sales. (Boothman Tr. 934–35; DX DIH, DX DIR). Mr. Duree had assumed only a slight increase. (DX DIR).

54. On Mr. Duree's cross examination, he admitted that at his calculated rate of incremental profitability, the assumed 26% increase in revenues represented by Lextron's sales over the damages period would result in a 192% increase in profitability for Micro over its historic levels for the damages period. (Duree Tr. 776; PX 472). The Court finds such a possibility unlikely, and questions the validity of any such analysis.

### (2) *Net Profitability*

55. The microingredient business is a high volume, low margin business for both parties. (Boothman Tr. 915–17; Anderson Tr. 821–22). The cost of the microingredients represents approximately 85% of the cost of doing business, so that gross margins before any operating expenses of the parties are deducted are only on the order of 15%. (Boothman Tr. 917).

56. Accordingly, the net profitabilities for the parties on sales of microingredients has historically been quite low. For the period from 1988–1997, Micro's net pre-tax profit averaged only 2.6%, with a total for the period of approximately $4.8 million. (DX DHV, PX 472). For the same time period, Lextron's net profit averaged only 4 .4%, with total pre-tax profits for the period of $5.5 million. (DX DHB–7).

### D. The Type Of Microingredients To Be Included In The Royalty Calculation

57. The parties offered different views on the microingredient sales that should properly be included in the royalty calculation. Micro argued that all of Lextron's microingredient sales to feedlots with a Lextron Type 2 machine should be subject to the damages calculation. (Nawrocki Tr. 530–31). Lextron asserted that the royalty base for purposes of determining damages should exclude sales of microingredients that do not use the patented technology and are not run through the machine. (Jarosz Tr. 959–61). Lextron's total sales of all microingredients for the period from 1988–1997 was $93.1 million. (PX 470).

58. The microingredients that Lextron sells may be grouped into three different types. The dry ingredients are actually weighed by the machine. The liquid microingredients are dispensed volumetrically. A third type, consisting of two groups of microingredients known generically as Cobactin and Smartamine, are run through separate dispensing machines and inserted into the discharge lines. (Ackerman Tr. 865–69).

59. To decide the issue of what microingredients should be subject to the royalty calculation, the Court must consider the parties' respective positions in 1988 when the alleged infringement began. Mr. Pratt and other Micro witnesses testified that it was foreseeable that all three types of microingredients would be sold to Lextron's feedlot customers, and accordingly, all of Lextron's microingredient sales should be subject to a royalty. (Pratt Tr. 365; Nawrocki Tr. 528–29).

60. However, Mr. Pratt also conceded several points on cross examination. First, he testified that the claims of the '971 patent only cover microingredients that are dispensed by weight. (Pratt Tr. 425). Next, he admitted that Lextron had already licensed the volumetrically dispensing patents in the 1986 settlement agreement, and that license had expired in 1989. Finally, he conceded that Micro owns a patent on a Cobactin machine upon which Lextron does not infringe, and that Micro itself has weigh machine customers who do not purchase Cobactin from it. (Pratt Tr. 422–23).

61. Lextron's witnesses made essentially the same points, claiming that in a hypothetical 1988 negotiation, see ¶ 99 *infra*, Lextron would not have agreed to pay further royalties on the liquid ingredients which were dispensed by volume. (Hummel Tr. 177–80). Rather than pay such royalties, Lextron's witnesses indicated that they would have opted instead to employ their existing volume machine and the noninfringing Type 3 weigh machine. (Hummel Tr. 167–68; Anderson Tr. 820–21).

62. Nevertheless, the Court finds that the sales of liquid microingredients are inextricably linked to the placement of the microingredient machines, and thus will be included in the royalty base. The Court finds that Lextron's sales of Cobactin and Smartamine products should be excluded. In addition to being run through separate machines, the Court notes that Lextron did not even begin selling these products until well after the royalty negotiation would have taken place. Cobaction was

introduced in 1990 while Smartamine was first sold in 1995. (DX DHB–7). Accordingly, the Court finds that the Lextron dry and liquid microingredient sales in the amount of $86,239,126 represent the appropriate royalty base for the damages calculation in this action.

### E. *The Applicable Royalty Rate*

63. The parties each offered expert testimony on the royalty rate to be applied in this case. Micro's expert, Mr. Nawrocki set the rate at 4 to 6% if all microingredient sales were included in the royalty base and at 6 to 8% if only the weigh sales were included. (Nawrocki Tr. 526–27). Lextron's expert, Mr. Jarosz set the rate at 1%. (Jarosz Tr. 1009). Each party's expert reviewed the well-known *Georgia–Pacific* factors during the course of his analysis. For the reasons set forth below, the Court credits Mr. Jarosz's testimony as being more persuasive.

64. Although Mr. Nawrocki posited a range of rates as noted above, he and Mr. Duree presented only two damages scenarios. (PX 469). Under the first scenario, a 6% rate was applied to all of Lextron's microingredient sales, resulting in a proposed damages award of $5.5 million. (PX 470). Under the second scenario, an 8% rate was applied to Lextron's weigh sales with resultant damages of $5.2 million. (PX 471).

65. Either of these scenarios would lead to the disgorgement of substantially all of Lextron's $5.5 million in net profits over the entire period from 1988–1997. When questioned about the propriety of this result, Mr. Nawrocki testified variously that Lextron focuses on gross margins (Nawrocki Tr. 580); that Lextron would be willing to part with all of its profits to protect its remaining business (Nawrocki Tr. 569); that 6% represents the mid-point between the 1% rate proposed by Lextron witnesses and the 12% proposed by Micro

witnesses (Nawrocki Tr. 582), and that Lextron could afford to pay damages in this amount. (Nawrocki Tr. 587).

66. The Court finds none of Mr. Nawrocki's arguments probative of an appropriate royalty rate. Mr. Nawrocki did not consider alternative machines available to Lextron, or the advantages, if any, of the '971 patented machine over other alternatives, except in conclusory fashion. (Nawrocki Tr. 570, 626–27 and 653). The proffered 12% incremental profit rate was also unsupported upon review of Mr. Duree's study arriving at that figure. Ms. Boothman's analysis of the incremental profit rate was far lower. (See discussion *supra*). Moreover, Lextron's witnesses credibly testified that the microingredient business is not used to support its other animal health care businesses. (Hummel Tr. 172–73; Anderson Tr. 807). Finally, the Court is not inclined to "split the baby". The parties have arrived at two very different suggested royalty rates by two very different methodologies, and splitting the difference is not an appropriate way to resolve this issue. Accordingly, the Court declines to accept the royalty rates proposed by Mr. Nawrocki.

67. As noted above, Lextron's expert, Mr. Jarosz determined that the parties reasonably would have agreed on a 1.0% rate at a hypothetical 1988 negotiation. In addition to a review of the *Georgia–Pacific* factors to support this rate, Mr. Jarosz also conducted an incremental profitability analysis based on Lextron's three-year projections from 1988 for the microingredient business. (DX MX, DX MY). From this study, Mr. Jarosz concluded that Lextron's anticipated net profitability ranged from 0.2 to 1.6%, with 1.0% being slightly above the mid-point. (Jarosz Tr. 981–86, 1008–09; DX DHW).

68. Mr. Jarosz stated several reasons why the rate would not have exceeded

1.0%. Principal among these were the alternative machines available to Lextron and the fact that Lextron successfully converted all of its machines in 1997 at a cost of approximately $300,000. (Jarosz Tr. 965–66). Mr. Jarosz also compared the 1.0% rate with the parties' average net profitabilities over the period from 1988–1997, noting that 1.0% represented approximately one-quarter of Lextron's average profitability of 4.4%, and more than one-third of Micro's net profitability of 2.6% for the damages period. (Jarosz Tr. 1009–1011; DX DHV, DX DHU).

69. For the reasons set forth, the Court concludes that 1.0% is the appropriate rate to be applied in this case for the determination of damages. Applying this rate to the royalty base of $86,239,126 noted above results in reasonable royalty damages of $862,239.

## VII. PREJUDGMENT INTEREST

70. In addition to compensatory damages, Micro also sought an award of prejudgment interest, arguing that it was required to engage in short term borrowing due to the sales revenues lost to Lextron. (Pratt Tr. 438; Duree Tr. 782–83).

71. Micro did not explain or attempt to demonstrate how the lost revenue stream affected its borrowing pattern. Micro also made no attempt to quantify how the lost revenues would have altered its short term debt structure. The Court notes that prior to the damages period, Micro had already borrowed against the business. (DX DBJ at 121). Throughout the period of claimed damages, the corporate borrowings were never allocated to the different components of its business, (Pratt Tr. 506), and Micro made no attempt to provide an appropriate allocation to the microingredient portion of its business at trial. In addition, Micro's president, Mr. Pratt, had borrowed heavily from the company and was indebted in an amount in excess of $2.8 million as of December 31, 1996. (Pratt Tr. 439–40; DX DDX).

72. The Court finds that Micro failed to establish a casual connection between the revenues allegedly lost to Lextron and its corporate borrowings. The Court further finds that prejudgment interest should be awarded at a rate which does not include a risk component. (Jarosz Tr. 1014–15). In accordance with Lextron's proffer, prejudgment interest is awarded at the rate for three-month Treasury bills compounded quarterly. This results in additional damages of $297,243. (DX DHB–14).

## CONCLUSIONS OF LAW

73. As noted previously, at a September 6, 2000, hearing, the Court ruled on summary judgment that Lextron's Type 5 machine did not infringe on the '971 patent claims asserted by Micro in this action. The Court also found that the Type 5 machine was an available, noninfringing alternative to Micro's patented machine, and that the record showed that there was no demand in the cattle feeding industry for microingredient machines. Based on these findings, the Court ruled that Micro's claim for lost profit damages were precluded from trial. Micro moved for reconsideration, and a hearing was held on September 28, 2000. After reviewing the briefs, and hearing oral argument, the Court denied Micro's motion for reconsideration.

## VIII. INFRINGEMENT

74. There are two steps to an infringement analysis: 1) determining the meaning and scope of the patent claims allegedly infringed, and 2) comparing the properly construed claims to the allegedly infringing device. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir.1995)(en banc), *aff'd*, 517 U.S. 370, 116

S.Ct. 1384, 134 L.Ed.2d 577 (1996). To support a finding of patent infringement, Micro must establish that the accused Lextron Type 5 machine includes every limitation of the asserted claims or its equivalent. *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed.Cir.1996).

75. Micro successfully argued before the Federal Circuit that mixing to create a uniform slurry of microingredients and liquid carrier is "a limitation in all of the claims" of the '971 patent, (Micro Appeal Brief at 40), stating as follows:

[T]he slurry must be a liquid microingredient admixture in which the microingredient particles are evenly distributed and not sinking in the admixture: in other words, a uniform or homogenous slurry. The court's contrary conclusion was legal error.

Micro Appeal Brief at 47.

76. According to Micro's president, William Pratt, this homogeneous, uniform mixture was essential to ensure accurate delivery of the microingredients to the final feed. (Trial Tr. at 403–04). The prior art Lextron volume machines employed a mechanical mixer to create such a homogeneous slurry. *See Micro Chemical, Inc. .*, 900 F.Supp. at 1403. Although the Brewster prior art weigh machine used a water delivery system, including flush rings and a discharge pump like the Lextron Type 5 machine, Micro argued to the Federal Circuit that the Brewster machine was distinguishable from the '971 patented invention because the machine "did not create a uniform slurry" and operated "without any intermixing of the microingredients other than what mixing incidentally occurred." (Micro Appeal Brief at 4.)

77. The Federal Circuit necessarily accepted Micro's construction of the "intermixing" limitations as requiring the creation of a homogeneous slurry. Micro repeatedly argued before this Court and the Federal Circuit that "accurate delivery of microingredients" requires the formation of such a slurry. The "incidental mixing" attributed to the Brewster machine to create "a mixture of additives and carrier" as this Court interpreted the claim term "slurry," *Id.* at 1401, otherwise would have been sufficient to sustain the patent's invalidity on appeal. Construing the claims necessarily to require the creation of a homogeneous slurry was essential to the final judgment of validity. Accordingly, this construction of the patent claims is now the law of the case and binding on the parties. *See W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1278 (Fed.Cir.1988).

78. Micro argues that the Federal Circuit did not address the issue of claim construction, pointing to the Federal Circuit's statement that "[w]e have considered the parties' other arguments and conclude that they are either unpersuasive or unnecessary for resolution of this appeal" to the level of a "holding". *See Great Plains Chemical Co.*, 103 F.3d at 1551. The Court rejects this argument. Having persuaded the Federal Circuit to adopt a narrow construction of the "intermixing" claim limitations to preserve the patent's validity over the prior art machines, Micro must construe the claims the same way on its infringement charges against the Type 5 machine. Micro's claim that any "mixing" will do, would impermissibly broaden the claims to cover every machine that uses a water delivery system, clearly part of the Brewster prior art. (PX 2, Third Supplemental Information Disclosure Statement at 2–3).

79. Micro also contended on summary judgment that the Lextron witnesses which it deposed admitted infringement by conceding that the Type 5 machines "mix." This argument is similarly unpersuasive. Lextron's witnesses simply acknowledged

that when the water and microingredients are pumped for delivery to the cattle feed, inherently there will be some mixing. However, this is not the same as the "intermixing" required by the patent, but, as the witnesses indicated, the type of "incidental mixing" due to pumping accomplished by Brewster and part of the prior art.

80. The asserted patent claims require a homogeneous slurry, not simply "turbulence." Micro failed to rebut, or even address Dr. Wray's tests and conclusions that the Type 5 machines did not create a uniform, homogeneous slurry. Nowhere in its opposition did Micro offer any competent evidence to establish that such a slurry is created by these machines. Accordingly, Micro failed to establish the existence of a triable issue of fact on its infringement charge.

■ 81. Claims must be interpreted the same way for infringement as they are for validity. *See, e.g. Jonsson v. Stanley Works*, 903 F.2d 812, 821 (Fed.Cir.1990). In the instant suit, the Lextron Type 5 machines do not include a mixing mechanism or any other means to create a uniform, homogeneous slurry. (Wray Decl., Defendant's Motion for Summary Judgment, Exhibit I, June 21, 2000). Because this is a limitation of all of the claims of the '971 patent when the claims are properly interpreted according to Micro's own proffered claim construction, summary judgment in Lextron's favor was entered as a matter of law.

■ 82. Although Micro only referred to the doctrine of equivalents in passing, the Court will address that issue as well. An accused product which does not literally infringe a claim may infringe under the doctrine of equivalents "if it performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct.

854, 94 L.Ed. 1097 (1950); *see Hill–Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1343 (Fed.Cir.2000).

83. The doctrine of equivalents attempts to strike a balance between ensuring that the patentee enjoys the full benefit of his patent and ensuring that the claims give "fair notice" of the patent's scope. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. ., Ltd.*, 234 F.3d 558, 564 (Fed.Cir.2000) *(en banc)*. The Federal Circuit has observed that this balance can be easily upset because "the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement." *Id.* (quoting *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)).

■ 84. To ensure that the range of equivalents that a patentee may claim is appropriately constrained, the Supreme Court has held in *Warner–Jenkinson* that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner–Jenkinson Co.*, 520 U.S at 29, 117 S.Ct. 1040. As the Court further stated, "[i]t is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Id.* This is known as the "all elements" rule. *Id.* at 40, 117 S.Ct. 1040; *see Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1429 (Fed.Cir.1997). In addition, the Federal Circuit also has held that the range of equivalents sought by a patentee may not ensnare the prior art. *See Streamfeeder LLC v. Sure–Feed Inc.*, 175 F.3d 974, 50 U.S.P.Q.2d 1515, 1519–20 (Fed.Cir.1999).

85. Lextron demonstrated in its motion for summary judgment that Micro's theory of equivalence would entirely vitiate the "intermixing" limitations of the '971 patent because there is no mixing mechanism or its equivalent in the Lextron Type 5 machine to create a uniform, homogeneous slurry as required by the claims. The Type 5 machine simply does not include this element or any substantial equivalent.

86. What occurs during pumping and flushing of the microingredients in the Type 5 machine is the separate step of delivering the microingredients to the feed. Any attempt to equate the Type 5 machine's operation with the subject matter covered by the asserted claims of the '971 patent would effectively eliminate the "intermixing" limitation. Moreover, a range of equivalents for the "intermixing" limitation that would encompass the Type 5 machine would also improperly impinge upon the Brewster prior art and its "incidental mixing" during pumping. *See Streamfeeder LLC*, 175 F.3d 974, 50 U.S.P.Q.2d at 1519–20. Accordingly, Micro's infringement charge under the doctrine of equivalents cannot be sustained.

87. Because the accused Type 5 machine does not include a mixing mechanism or its equivalent, the "intermixing" limitations of the '971 patent are entirely missing from the accused device. Thus, there can be no infringement under the doctrine of equivalents, and Lextron was entitled to summary judgment of noninfringement under the doctrine. *See Warner–Jenkinson,* 520 U.S. at 39 n. 8, 117 S.Ct. 1040 ("[I]f a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve.") (emphasis in original).

## IX. Lost Profits

88. In order to obtain damages for patent infringement in the form of lost profits, the patentee must establish 1) demand for the patented product, 2) the absence of acceptable non-infringing substitutes, 3) manufacturing and marketing capability to exploit the demand, and 4) the amount of profit it would have made. *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir. 1978). For an award of damages based upon lost profits, the patent owner must prove "causation in fact" establishing that "but for" the actions of the infringer, the patentee would have made the sales made by the infringer. *See Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1545 (Fed.Cir. 1995).

89. On summary judgment, the Court determined that Micro's claim for lost profit damages in this action was properly precluded because Micro was unable to demonstrate "causation in fact" due to a lack of demand for the patented features of the invention and the availability of acceptable noninfringing substitutes.

90. Micro argued that demand could be presumed for its patented invention based on the widespread use of weigh machines in the cattle feeding industry. Micro also argued that other methods of delivering microingredients to the cattle feed, including noninfringing microingredient machines, are not suitable alternatives both because they lack all of the features of the patented invention, and, with respect to the Type 5 machine, because it was not offered by Lextron to its customers during the period for which damages are being sought. The Court finds both of these arguments to be unpersuasive.

91. To establish causation and "but for" probability, Micro must first show a demand for its invention. *Panduit,* 575 F.2d at 1156. This is not synonymous with

showing a need for microingredient machines, or even microingredient weigh machines, which are not broadly covered by the '971 patent in suit. Despite Micro's protests, it was unable to do more here. As Micro itself recognizes, purchasers of microingredients have opted to use other noninfringing machines throughout the period of claimed damages. More importantly, this Court has already found, at Micro's urging, that the relevant market is for the microingredients themselves, rather than microingredient machines, whether covered by the '971 patent or not.

92. Most feedlots with sufficiently large capacities to warrant use of a microingredient machine do not use these machines at all. Instead, they purchase their microingredient requirements in prepackaged feed supplements which can be added directly to the feed. *Great Plains Chemical Co.*, 900 F.Supp. at 1399 ("[m]ore than 50% of the feedlots still utilize feed supplements or top dressing"). Simply stated, the demand that exists in the feedlot industry is for the microingredients that are added to the cattle feed. *Id.* At the prior trial on liability, Micro argued that the majority of feedlots add their microingredients through premixed supplements or employ the top dress methods to establish that it is the microingredients that are important to consumers while the delivery method is secondary. This argument was advanced to avoid exposure on Lextron's antitrust counterclaims.

93. In quantifying its damages, Micro's claim to lost profits on substantially all of Lextron's sales of microingredients failed to take into account either the various alternative methods of microingredient delivery or the Court's findings on the relevant market. Micro also did not account for the factors that would affect the decision of a feedlot to purchase its microingredient requirements for use through a microingredient machine (either weigh or volume and covered by the patent or not) or forego the use of a machine altogether. Micro's claim for lost profits included no market share apportionment or any other methodology to account for these variables, particularly the competition that both parties experienced from feed supplements. Thus, Micro's lost profits claim was flawed from its inception.

94. In addition, Micro failed to address Lextron's retention of substantially all of its customers with the noninfringing Type 5 machine. These machines, which had the mechanical mixers removed and were thus incapable of creating a homogeneous slurry as required by the patent, were universally accepted by Lextron's customers.

95. In sum, Micro simply failed to offer competent proof to support the first prong of the *Panduit* test that a significant demand for the machine described in the '971 patent existed in the cattle feeding industry such as would support an award of lost profits. For this reason alone, its lost profits damages claim was properly precluded. *See Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed.Cir. 1991) ("Slimfold failed to show that *buyers* of bi-fold metal doors specifically want a door having the advantages of the Ford patent.") (emphasis in original).

96. In addition to the lack of demand, the availability of noninfringing alternatives under the second prong of the *Panduit* test has also been held to be fatal to a claim of lost profits. *See Slimfold Mfg. Co.*, 932 F.2d at 1458; *TP Orthodontics Inc. v. Professional Positioners, Inc.*, 20 U.S.P.Q.2d 1017, 1023, *aff'd*, 980 F.2d 743 (Fed.Cir.1992). Most recently the Federal Circuit so held in its *Grain Processing* decision. *Grain Processing Corp. v. American Maize–Products*, 185 F.3d 1341, 1356 (Fed.Cir.1999). The Court has found

the Type 5 machine to be a noninfringing alternative to Micro's patented machine. *See* ¶ 28 *supra.*

97. As noted in the discussion above, Micro's failure to adequately account for availability of the noninfringing alternatives, which Micro itself had advanced at the 1993 liability trial, was fatal to its lost profits claim. Micro could not establish "causation in fact" for its claimed entitlement to lost profits on nearly all of Lextron's sales during the damages period without accounting for these other market participants. The claim is therefore too speculative to support a recovery.

## X. REASONABLE ROYALTIES

98. A patent holder failing to prove an entitlement to lost profits has the burden to establish compensatory damages in the form of a reasonable royalty. *See* 35 U.S.C. § 284. Upon proof of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court." *Id.*

99. Reasonable royalty damages are based upon the expected result of a hypothetical negotiation between the patentee and the alleged infringer conducted at the time when the infringement began. *See Unisplay, S.A. v. American Electronic Sign Co.,* 69 F.3d 512, 517 (Fed.Cir.1995). In utilizing the "hypothetical license" approach, a reasonable royalty is defined as the amount that a willing licensor and willing licensee would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement. *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), *modified,* 446 F.2d 295 (2d. Cir. 1971), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971).

100. A list of some of the factors that are considered in determining a reasonable royalty was set out by the court in *Georgia–Pacific. Id.* at 1120. The Federal Circuit has accepted the *Georgia–Pacific* factors as the benchmark for reasonable royalty determinations. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 926 F.2d 1161, 1168 (Fed.Cir.1991). The overriding principle in the analysis is to ascertain fair compensation, which was defined by the *Georgia–Pacific* court as follows:

> [T]he amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been accepted by a prudent patentee who was willing to grant a licensee.

*Georgia–Pacific,* 318 F.Supp. at 1120.

101. The judicial determination of a reasonably royalty thus requires the Court to consider, insofar as established by the evidence, all relevant factors to arrive at an appropriate award. *Id.* The following *Georgia–Pacific* factors are particularly relevant to the Court's determination of a reasonable royalty in this case:

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

. . . .

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in

the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

. . . .

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

. . . .

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention or distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

*Id.*

■ 102. Where, as here, the patentee seeks damages on components sold with a patented apparatus, the "entire market value rule" may be applied. *See Rite–Hite Corp. • v. Kelley Co.,* 56 F.3d 1538, 1549 (Fed.Cir.1995). The entire market value rule is applicable where:

[T]he patented and unpatented components together are 'analogous to components of a single assembly,' 'parts of a complete machine,' or 'constitute a functional unit,' but not where the unpatented components 'have essentially no functional relationship to the patented invention and ... may have been sold only as a matter of convenience or business advantage.'

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.,* 192 F.3d 1353, 1362 (Fed.Cir.1999).

■ 103. Because the microingredient machines are provided to the feedlot customers at no charge, the parties agreed that a reasonable royalty in this case should be based on the sale of microingredients for use in the machine. Micro's expert, Mr. Nawrocki, set the royalty rate at 6 to 8% dependent on the applicable sales base, while Lextron's expert Mr. Jarosz testified that a rate of 1.0% would be appropriate.

104. During trial, Micro argued that the 1986 settlement agreement with Lextron overwhelmingly demonstrates the reasonableness of the six percent royalty. The Court finds this argument unpersuasive. In *Trell v. Marlee Electronics Corp.,* 912 F.2d 1443 (Fed.Cir.1990), the Federal Circuit rejected a reasonable royalty determination where the rate was based entirely on the existence of one other negotiated license. *Id.* at 1448. The lower court had held that six percent was the proper royalty rate on the basis of the license. *Id.* at 1445–46. The Federal Circuit, following the reasoning in *Hanson v. Alpine Valley Ski Area, Inc.,* rejected the single license as insufficient. *Trell,* 912 F.2d at 1446; *see also Deere & Co. v. Int'l Harvester Co.,* 710 F.2d 1551, 1557 (Fed.Cir. 1983). The court in *Trell* noted that an established royalty is one that has been "paid by such a number of persons as to indicate a general acquiescence in its rea-

sonableness by those who have occasion to use the invention." *Id.* (*quoting Hanson,* 718 F.2d at 1078). The Federal Circuit then pointed out that the trial court should have focused on the patentee's obligation to prove what a reasonable royalty would be, and absent a sufficient number of license agreements or other probative evidence, the trial court should have determined a reasonable royalty through the fictional "willing buyer/willing seller" test. *Id.*

105. Several courts have decided that royalties paid as a result of settlement negotiations do not accurately reflect what a willing licensee would pay in an arms-length negotiation, and, as a result, have viewed settlement agreements with caution and commonly have excluded them altogether. *See Donnelly Corp. v. Gentex Corp.,* 918 F.Supp. 1126, 1135 (W.D.Mich. 1996); *Wang Labs, Inc. v. Mitsubishi Elecs. America, Inc.,* 860 F.Supp. 1448, 1452 (C.D.Cal.1993).

106. Micro's damages estimation distorts the reasonable royalty determination by incorrectly characterizing the market for microingredient machines as a "two supplier" market with Lextron being its only serious competitor. This argument ignores the Court's findings regarding the alternatives available to the cattle feedlot industry to meet their microingredient needs. *Micro Chemical, Inc.,* 900 F.Supp. at 1399. In view of the broader market with head-to-head competition from feed supplement manufacturers, as well as the lack of demand for the patented machine (see discussion *supra),* Micro was not in any position to retain the entire market as it asserts. *Cf. C.R. Bard, Inc. v. Boston Scientific Corp.,* 250 F.3d 761 (Fed.Cir. 2000) (unpublished)(finding a lack of noninfringing substitutes because the products *did not* compete "head to head").

107. Micro's argument also improperly assumes that Lextron had no other options but to market an infringing machine. Again, this is contrary to the evidence of record and the Court's prior rulings. The Court here has already found that Lextron had developed a noninfringing alternative in the Type 3 ("no mix") machine at the time when the alleged infringement began. Indeed, Micro ultimately conceded that the Type 3 was noninfringing, as previously noted by the Court: "Plaintiff has stipulated that Lextron Type 3 machines, the type without a mechanical mixer in the mix tank, do not infringe any claim in the '971 patent." *Micro Chemical, Inc.,* 900 F.Supp. at 1395.

108. Lextron had a viable alternative machine, reducing the dynamic from Lextron's perspective to a choice between the cost of converting its machines to the Type 3 design versus the cost of accepting a license under the patent and paying Micro a similar sum in the form of a royalty to continue to manufacture the Type 2 machine. As noted above, the cost of converting these machines was slightly in excess of $300,000 in 1997.

109. Further, in 1988, when the hypothetical negotiation would have occurred, there were 200 microingredient dispensing machines being used by cattle feedlots supplied by Lextron and Micro, of which approximately 140 were volume machines. That two-thirds of the microingredient dispensing machines then in use were volume machines plainly establishes that the volume machine was a viable noninfringing alternative at the time. That almost 20% of the microingredient machines in use in 1997 at the end of the period of claimed damages remained volume machines similarly establishes that volume machines continued to be viable, noninfringing alternatives to the '971 patented invention. The availability of these machines would have substantially lowered a negotiated

rate. *See Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571–72 (Fed.Cir.1996).

110. In addition, as noted above, the market for microingredient sales is dominated by feed supplement manufacturers and distributors of microingredient products for top dressing application. Both of these alternative methods are less expensive than employing a microingredient dispensing machine. The competitive concerns created by the presence of these lower priced alternatives would have exerted a significant downward pressure on any rate ultimately agreed to by the parties.

111. Although there is no rule that reasonable royalty damages be no higher than the infringer's net profit margin, *see State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed.Cir.1989), a reasonable royalty is one that leaves the infringer with some profit. *See Georgia–Pacific*, 318 F.Supp. at 1121–22; *Hughes Tool Co. v. Dresser Indus., Inc.*, 816 F.2d 1549, 1558 (Fed.Cir.), *cert. denied*, 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987). After all, no reasonable person would enter into a license in which they had agreed to pay more than their expected profit. *See Hanson v. Alpine Valley Ski Area*, 718 F.2d 1075, 1081 (Fed.Cir.1983). The increased royalty, also known as a *"Panduit"* kicker, that Micro advocates has been specifically discredited by the Federal Circuit. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1581 (Fed.Cir.1996) (*"Panduit* does not authorize additional damages or a "kicker" on top of a reasonable royalty because of heavy litigation or other expenses ... *Panduit* at no point suggested enhancement of a compensatory damage award as a substitute for the strict requirements for these statutory provisions.").

112. For example, in *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 788 F.2d 1554 (Fed.Cir.1986), the Federal Circuit affirmed the lower court's rejection of the royalty figures urged by the patentee. In dismissing Radio Steel's figure of 21%, the appellate court noted that even though the infringer was unable to show that there were noninfringing alternatives to the patented invention, a 21% royalty rate would allow the company to collect unreasonably high royalties from sales that Radio Steel had been unable to establish on its own. *Id.* Therefore, the Federal Circuit affirmed the district court's selection of ten percent as a reasonable royalty. *Id.* at 1556.

113. In this action, many of Lextron's customers are not accessible to Micro's marketing and sales force, simply preferring to do business with Lextron. Among the considerations for these customers are the service that Lextron provides in addition to the sale of microingredients, the pricing of the microingredients available from Lextron, the personal relationships that have been established, and the provision by Lextron of various other automated systems for use by the feedlots in addition to the machines at issue. In sum, the many of Lextron's customers would have remained Lextron's customers for reasons that had little to do with their use of a Type 2 machine, which represents another factor depressing a potential royalty rate.

114. The Court's ruling that Micro has not established a demand for its patented invention is fully applicable to these circumstances. To contend, as Micro has, that a royalty should be based on its expectations to profit from use of the invention, Micro must first establish that consumers would choose to deal with it and select the patented device over other available options. The Court has already found that Micro has failed to make such a showing here. In light of the above discussion, the Court concludes that the appropriate analysis of the Georgia Pacific factors was conducted by defendant's expert Jarosz.

115. In addition to the Cobactin and Smartamine products, Micro also seeks to recover for sales of over $20 million worth of liquid microingredients that are dispensed volumetrically in Lextron's Type 2 weigh machines—the same way they have been dispensed since the late 1970's through Lextron's volume machines. The patent statutes provide for damages in the form of "a reasonable royalty *for the use made of the invention* by the infringer ..." 35 U.S.C. § 284 (emphasis added). While the patent claims asserted against Lextron expressly cover an invention in which all the microingredients are dispensed based upon their weight, the evidence at trial demonstrated that sales of liquid microingredients were inextricably tied to the sales of the dry microingredients. Evidence at trial also showed that some of Lextron's customers purchased Cobactin and Smartamine from third-parties. For these reasons, a negotiation to determine a reasonable royalty for the '971 patent would have included volumetrically dispensed microingredients, but excluded Cobactin and Smartamine, even if they had been available in 1988.

## XI. PREJUDGMENT INTEREST

■ 116. Courts ordinarily award prejudgment interest to the patent owner in patent infringement actions. *General Motors Corp. v. Devex*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). The award of prejudgment interest is within the Court's discretion. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed.Cir. 1996). The Court may also decline to make such an award. *Hughes Tool Co.*, 816 F.2d at 1558. As with its other damages calculations, the Court determines that the prejudgment interest award which Micro proposed is inflated. Here, Micro contends that it is entitled to prejudgment interest based on an elevated interest rate associated with Micro's corporate borrowing. This rate incorporates a risk factor that is inapplicable to an award of prejudgment interest. Moreover, there is no evidence that Micro's pattern of borrowing was in any way the result of the alleged infringement.

117. The purpose of prejudgment interest is solely to compensate the patentee for the loss of the use of royalty income the patentee would have been paid. *See General Motors Corp.*, 461 U.S. at 654, 103 S.Ct. 2058; *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 846 F.Supp. 542, 550–51 (S.D.Tex.1994). Prejudgment interest has no punitive, only compensatory, purposes. *Oiness*, 88 F.3d at 1033. As such, courts have typically declined to award a high rate that includes assumptions of risk that have nothing to do with the allegations of infringement. *See Fonar Corp. v. General Elec. Co.*, 902 F.Supp. 330, 354 (E.D.N.Y. 1995) (rates for U.S. Treasury bills); *Schneider (Europe) AG v. SciMed Life Systems, Inc.*, 852 F.Supp. 813 (D.Minn. 1994) (rates for government securities); *Avco Corp. v. PPG Industries, Inc.*, 867 F.Supp. 84 (D.Mass.1994) (three month U.S. Treasury bill). Accordingly, a risk-free rate is appropriate in this action. Here, as noted above, the Court will award prejudgment interest at the three month Treasury bill rate compounded quarterly.

## XII. CONCLUSION

118. For the reasons set forth, the facts of this case plainly do not support an award of damages based upon Micro's theory of recovery. The appropriate measure of damages in this action as outlined above is a reasonable royalty which gives due regard to all of the relevant factors that necessarily must be considered in determining fair compensation for Micro's alleged injury. Based on the findings and conclusions set forth herein, the Court finds that Micro is entitled to a reasonable royalty in the amount of $862,239 with

prejudgment interest in the amount of $297,243 representing a total damage award of $1,159,482. Judgment will be entered by the Court accordingly. Therefore, it is

ORDERED that judgment is entered in favor of Micro Chemical, Inc., and against Lextron, Inc., in the amount of $1,159,482. It is

FURTHER ORDERED that post-judgment interest shall accrue at the legal rate of 3.44% per annum.